Roth v. Jennings

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2006

(Argued: February 21, 2007          Decided: June 6, 2007)


Docket No. 06-0784-cv

_____

ANDREW E. ROTH, derivatively on behalf of METAL MANAGEMENT, INC.,

                                    Plaintiff-Appellant,

                            - v. -

T. BENJAMIN JENNINGS, EUROPEAN METAL RECYCLING, LTD., and METAL MANAGEMENT, INC.,

                                    Defendants-Appellees.
_____

Before:  KEARSE, CABRANES, and KATZMANN, Circuit Judges.

        Appeal from a judgment entered pursuant to Fed. R. Civ. P. 12(b)(6) in the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, dismissing a derivative action brought under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), for disgorgement of short-swing profits from stock sales made by one defendant as part of an alleged "group" within the meaning of the Act.

        Affirmed in part; vacated and remanded in part.

                    PAUL D. WEXLER, New York, New York (Bragar Wexler & Eagel, New York, New York, Ostrager Chong Flaherty & Broitman, New York, New York, on the brief), for Plaintiff-Appellant.

ALLAN T. SLAGEL, Chicago, Illinois (Heather A. Jackson, Shefsky & Froelich, Chicago, Illinois, John J. Clarke, Jr., DLA Piper Rudnick Gray Cary, New York, New York, on the brief), for Defendant-Appellee Jennings.

THOMAS E. LYNCH, New York, New York (Steven C. Bennett, Jones Day, New York, New York, on the brief), for Defendant-Appellee European Metal Recycling, Ltd.

KEARSE, Circuit Judge:

Plaintiff Andrew E. Roth, suing derivatively on behalf of nominal defendant Metal Management, Inc. ("MMI" or "Metal Management"), for disgorgement to MMI of "short-swing profits" under § 16(b) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act"), 15 U.S.C. § 78p(b), appeals from a final judgment of the United States District Court for the Southern District of New York, Deborah A. Batts, Judge, granting motions by defendants T. Benjamin Jennings and European Metal Recycling, Ltd. ("EMR") (collectively "defendants"), to dismiss the complaint for failure to state a claim on which relief can be granted. The complaint alleged that Jennings and EMR as a "group," within the meaning of the Act, owned more than 10 percent of MMI's outstanding stock; that within a period of less than six months, Jennings purchased and sold MMI stock at a profit of some $4.25 million; and that § 16(b) required the disgorgement of that profit to MMI. The district court granted both defendants' motions to dismiss on the ground that the complaint was insufficient to plead that defendants acted as a group, given the disclaimers of group status in documents filed by defendants with the Securities

and Exchange Commission ("SEC").  The court ruled that the claim against EMR was also dismissable on the ground that the complaint did not allege that EMR itself had engaged in any short-swing transactions or received any pecuniary profit from the MMI stock transactions by Jennings.  For the reasons that follow, we affirm the dismissal of the claim against EMR, but we vacate the dismissal of the claim against Jennings and remand for further proceedings.

I.  BACKGROUND

For purposes of reviewing the dismissal of a complaint for failure to state a claim, we accept the complaint's factual allegations, and all reasonable inferences that can be drawn from those allegations in the plaintiff's favor, as true.  See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993); Overton v. Todman & Co., 478 F.3d 479, 483 (2d Cir. 2007).  The following description is taken from allegations in the complaint and from documents referred to in the complaint which were filed by EMR or Jennings with the SEC pursuant to SEC Rule 13d-1 and Schedule 13D, 17 C.F.R. §§ 240.13d-1(a), 240.13d-101 ("Schedule 13D" filings).

A.  The Parties and the Transactions in MMI Stock

Metal Management (or "the Company"), which describes itself as one of the nation's largest full-service scrap metal recyclers, is a publicly owned Delaware corporation headquartered in

Chicago, Illinois.  EMR is a privately owned scrap metal processing company headquartered in the United Kingdom.  Jennings, an Illinois resident, is a former chairman and chief executive officer of MMI.

On May 15 and May 21, 2003, EMR purchased a total of 1,503,100 shares of MMI common stock in open-market transactions.  These shares represented approximately 14.8 percent of MMI's outstanding common stock.  (See Complaint ¶ 13.)  The Schedule 13D filed by EMR with respect to those transactions stated that

> EMR has taken certain actions that indicate that EMR may be deemed to have the current intent to seek to change or influence control of the Company, although it has not formulated any specific plan or proposal in this regard. . . .  Any such plan or proposal that may be formulated could involve, among other things, entering into one or more privately negotiated acquisitions of additional Company securities, open-market purchases, proposing a business combination transaction with the Company, making a tender offer for some or all of the Shares or waging a proxy contest for control of the Company.

(EMR Schedule 13D dated June 2, 2003, at 4 (emphases added).)

On May 29 and 30, 2003, Jennings, in open-market transactions, purchased a total of 842,000 shares of MMI common stock.  (See Complaint ¶ 9.)  These shares constituted approximately 8.3 percent of MMI's outstanding stock.  (See Jennings Schedule 13D dated June 9, 2003, at 2.)  The per-share prices ranged from $10.95 to $11.55, for a total purchase price of $9,517,350; Jennings paid for the shares by obtaining a $10 million loan from EMR.  (See Complaint ¶¶ 8, 9, 14.)  According to the terms of the EMR-Jennings loan agreement, the loan was unsecured; the interest rate was 4 percent per annum.  (See Jennings Schedule 13D dated June 9, 2003, Exhibit A; EMR Schedule 13D dated June 9, 2003, Exhibit I.)

Roth's complaint alleged that "[t]he loan was made for the specific purpose of buying MMI securities in furtherance of EMR's and Jennings [sic] agreement to work together to effect a change of control or similar transaction involving MMI" (Complaint ¶ 8), and that Jennings and EMR therefore constituted a "group" within the meaning of § 13(d) of the Act for purposes of determining each entity's beneficial ownership of MMI stock under § 16 of the Act (e.g., id. ¶¶ 6, 7, 11). The complaint alleged that under § 16(b), "each member of [the] Group is liable to pay to the issuer all profits earned by that Group member in stock transactions effected within a six-month period during which time the Group owned a greater than 10% beneficial interest in the issuer's stock." (Id. ¶ 12.)

On July 14 and 15, 2003, Jennings sold 16,000 of his MMI shares, at prices ranging from $18.6483 to $19.06 per share. (See Complaint ¶ 15.) From August 19 through September 9, 2003, he sold an additional 602,900 shares, at prices ranging from $18 to $18.59 per share. (See id. ¶ 16.) The complaint alleged that "[a]t all relevant times during the period while Jennings purchased and sold MMI common stock, the Group owned in excess of 10% of MMI's outstanding common stock." (Id. ¶ 13.) It alleged that Jennings's sales, which occurred less than six months after his purchases, resulted in profits totaling at least $4,249,408.80, and that Jennings and EMR are each "liable to the extent of its [sic] pecuniary [interest] in the . . . disgorgeable profits." (Id. ¶ 18; see id. ¶ 20.)

B.  The Motions To Dismiss and the District Court's Decision

Jennings and EMR moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim under § 16(b).  They attached to their respective motions several documents they had filed with the SEC--some of which were referred to in the complaint--which described, inter alia, the loan agreement between EMR and Jennings, certain of their transactions in MMI stock, and their respective MMI holdings.  The loan agreement, in the form of a June 9, 2003 letter from EMR to Jennings, signed as "[a]ccepted and agreed to" by Jennings ("Loan Agreement") stated--in the version attached to the Schedule 13D filed by EMR--as follows:

> This letter will evidence our legally binding agreements effective as of June 2, 2003:

> (1)  European Metal Recycling Ltd. ("EMR") has agreed to provide you with a bridge loan in an aggregate of up to U.S. $10,000,000 (the "Loan").

> (2)  The Loan shall be unsecured, shall accrue interest at the rate of Four Percent (4%) per annum, and shall be due and payable in full no later than ninety (90) days from the effective date hereof.

> (3)  EMR hereby acknowledges that you have used proceeds of the Loan to purchase shares of Common Stock of Metal Management, Inc.  EMR hereby acknowledges and agrees that you currently are not, nor in the future shall you, be under any obligation to vote, retain or dispose of such shares as part of, nor otherwise to participate in any way in any plans or proposals of, any "group" within the meaning of the applicable federal and state securities laws in regard to the securities of Metal Management, Inc., including any "group" that may in the future involve EMR in any way.

(EMR Schedule 13D dated June 9, 2003, Exhibit I; see also Jennings Schedule 13D dated June 9, 2003, Exhibit A (with slight linguistic

differences from EMR's Exhibit I).) Jennings and EMR argued that the complaint failed sufficiently to allege that they were a group within the meaning of the pertinent securities laws and that the Loan Agreement and their other SEC filings showed that they had disclaimed group status.

In a Memorandum and Order dated February 1, 2006, the district court agreed, granting both defendants' motions to dismiss. See 2006 WL 278135 (Feb. 2, 2006) ("District Court Opinion"). The court found principally that defendants' SEC filings disclaimed group status, and it held that notwithstanding the contrary allegations of the complaint, defendants' disclaimers were controlling.

The court began its discussion by noting that in considering a motion to dismiss pursuant to Rule 12(b)(6), the court is required to accept as true the factual allegations in the complaint, draw all reasonable inferences in favor of the plaintiff, and refrain from assessing the weight of the evidence that might be offered in support of the complaint. The court noted that such a motion should be granted "'only if, after viewing plaintiff's allegations in this favorable light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."'" District Court Opinion, 2006 WL 278135, at *3 (quoting Walker v. City of New York, 974 F.2d 293, 298 (2d Cir. 1992) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)), cert. denied, 507 U.S. 961 (1993)). The court also stated that

consideration of a Rule 12(b)(6) motion is limited

-7-

to the factual allegations in the complaint, documents attached to the complaint as exhibits or incorporated in it by reference, to matters of which judicial notice might be taken, or to documents either in plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit.

District Court Opinion, 2006 WL 278135, at *3. It added that

the Second Circuit has held that "when a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC," as these are documents that should be noticed by the Court. Cortec Indus., Inc.[ v. Sum Holding L.P.], 949 F.2d [42, 47 (2d Cir. 1991)] (referencing Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

District Court Opinion, 2006 WL 278135, at *3.

As to the merits of the motions, the court noted that, in order to show that Jennings's purchases, amounting to 8.3 percent of MMI's shares, were subject to § 16(b), Roth was required to show that EMR and Jennings constituted a "group" within the meaning of the Act, that is, that they "'combined in furtherance of a common objective.'" District Court Opinion, 2006 WL 278135, at *4 (quoting Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982), cert. denied, 460 U.S. 1069 (1983)). The court stated that "[i]n order to plead group activity sufficiently, Plaintiff is not required to allege that a common objective of actual corporate control existed among the defendants, but simply that the defendants acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the issuer," although "the concerted action of the group's members need not be expressly memorialized in writing." District Court Opinion, 2006 WL 278135,

at *4 (internal quotation marks and brackets omitted).

The court ruled, however, that Roth's complaint "d[id] not sufficiently allege such an agreed-upon common purpose" between EMR and Jennings. Id. at *5. Citing Schedule 13D filings by EMR and Jennings, respectively, the court observed that the Schedule 13D filed by Jennings in June 2003, which disclosed Jennings's purchases of MMI shares and the loan from EMR, stated (a) that "'[t]here are no arrangements or understandings between EMR and [Jennings] as to how [Jennings] would utilize the proceeds of the [L]oan,'" and (b) that Jennings "'does not have any definite plans regarding an extraordinary corporate transaction, such as a merger, reorganization or liquidation involving [MMI] or a sale or transfer of a material amount of assets of [MMI] or any of its subsidiaries.'" District Court Opinion, 2006 WL 278135, at *1-*2 (quoting Jennings Schedule 13D dated June 9, 2003, at 3) (emphasis ours). The court noted also that EMR's Schedule 13D disclosing its loan to Jennings stated that

> [EMR] has no contract, arrangement[] or understanding of any kind with Mr. Jennings with respect to the Common Stock [of MMI] owned by [EMR] or by Mr. Jennings; . . . expressly disclaims any direct or indirect beneficial ownership in the Common Stock [of MMI] owned by Mr. Jennings; and further disclaims any "group" status with Mr. Jennings.

District Court Opinion, 2006 WL 278135, at *2 (quoting EMR Schedule 13D dated June 9, 2003, at 3) (other internal quotation marks omitted) (emphasis ours). And the court noted that

> [t]he loan agreement signed by both Jennings and EMR's managing director expressly states that Jennings and EMR are in no way, either by the loan of June 9, 2003 or at any time in the future, to be

considered a "group" or part of any group that might include more than the Defendants. . . . EMR filed an amended 13D schedule after loaning money to Jennings, which further declared that the loan did not constitute group activity.

District Court Opinion, 2006 WL 278135, at *5 (emphases added). The court stated that defendants had thus "filed three separate statements with the SEC, asserting that their actions do not constitute group activity"; that their disclaimers conflicted with the allegations of the complaint; and that the complaint did not "explain the documents [that EMR and Jennings had] filed with the SEC." Id. The court accepted defendants' disclaimers as true. See id.

The district court rejected Roth's contention that, in ruling on the Rule 12(b)(6) motions, the court should not rely on defendants' disclaimers:

Plaintiff contends that the disclaimer of group status in the loan agreement and the subsequent amended 13D schedules by both Defendants was meant to circumvent liability even though the two were acting in concert. However, "unadorned allegations" based on "unmitigated speculation" that defendants are acting as a group are inadequate to sustain a Section 13(d) claim.[] Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972). In the instant case, Defendants have filed three separate statements with the SEC, asserting that their actions do not constitute group activity. The express disclaimer of group status conflicts with Plaintiff's allegations. Even interpreting the pleadings in a light most favorable to the Plaintiff, the Defendants' statements, which have been submitted to a government agency and made public, should not be contradicted or taken as perjurious simply because the Plaintiff, without evidence, says they are. See Matusovsky v. Merrill Lynch, 186 F.Supp.2d 397, 400 [(S.D.N.Y. 2002)] (stating that if a plaintiff's allegations are contradicted by a document considered in determining a Rule 12(b)(6) motion, those allegations are insufficient to defeat the motion); Rap[o]port v. Asia Elecs., 88 F.Supp.2d

179, 184 (S.D.N.Y. 2000) (stating that when documents contain statements that contradict the allegations in the complaint, the documents control and the court need not accept as true the allegations contained in the complaint).

District Court Opinion, 2006 WL 278135, at *5 (emphases added).

In addition, the district court ruled that the complaint would be dismissable "[e]ven were this Court not to accept the truth of Defendants' statements in their SEC filings." Id. The court concluded that § 16(b) was inapplicable because other evidence submitted by defendants indicated that EMR and Jennings could not be considered to have been a group at the time of Jennings's sales. Citing the language in § 16(b) that "[t]his subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security . . . involved," 15 U.S.C. § 78p(b), the court concluded that "for traders to constitute a 'group', the Exchange Act requires that their coordinated activity persist during the time of purchase and during the time of sale of the securities," District Court Opinion, 2006 WL 278135, at *6 (emphasis in original). The court noted that, according to documents submitted by defendants, EMR had offered in August 2003 to buy Jennings's shares at a below-market price and that Jennings had declined that offer and sold shares on the open market. See id. at *5 (citing EMR Schedule 13D dated August 12, 2003, Exhibit 1 (EMR letter offering to pay Jennings $13.50 per share)). The court found that

[s]uch transactions do not reflect two group members acting in concert to effectuate a common objective with regard to acquiring, holding, voting or disposing of securities of the issuer. . . . Had Defendants held a common purpose, Jennings likely

would have accepted EMR's offer. While group members need not march in lock step to qualify as a "group", . . . marching in opposite directions certainly counsels against concluding that Jennings acted with EMR as a "group". Jennings' refusal of EMR's offer contradicted precisely what one would have expected of him had he been acting in concert with EMR.

District Court Opinion, 2006 WL 278135, at *5 (internal quotation marks and brackets omitted) (emphases added); see id. ("[t]his evidence does not in any way approximate an instance of group activity, and belies allegations of any common objective shared by the Defendants" (emphasis added)); id. at *6 (in selling his shares on the open market, "Jennings did not act in concert with EMR at the time of sale; he did the opposite"). The court concluded that,

[a]ccordingly, EMR's shares cannot be aggregated with Jennings' to constitute the more than ten percent ownership required to warrant Section 16(b) liability. Neither EMR nor Jennings may be considered part of a "group."

Because the Complaint does not sufficiently aver that Defendants acted as a group at the time Jennings sold his MMI shares, because public SEC filings indicate that Defendants never intended to act as a group, and because Jennings alone did not own ten percent of a class of MMI's equity securit[ies], Jennings' Motion to Dismiss Plaintiff's Complaint is hereby GRANTED.

Id. (emphases added).

The court ruled that the claim against EMR should be dismissed on the additional ground that the complaint did not allege that EMR had made any sales of its own shares or had any direct or indirect pecuniary interest in the shares sold by Jennings.

Judgment was entered dismissing the complaint, and this appeal followed.

## II. DISCUSSION

On appeal, Roth contends principally that the district court erred in concluding that the complaint failed to state a claim on which relief can be granted against Jennings, arguing that the complaint sufficiently pleaded that EMR and Jennings acted as a group for the purpose of Jennings's acquisition of MMI shares, that defendants' disclaimers of group activity were not entitled to evidentiary weight in the consideration of Rule 12(b)(6) motions, and that Jennings's sales of his shares were not a basis for concluding that the "group" provisions no longer applied. For the reasons that follow, we agree.

### A. Section 16(b)

Section 16 of the Exchange Act, with respect to any company whose securities are registered on a national securities exchange, imposes certain obligations and restrictions on the company's officers, directors, and "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security)," 15 U.S.C. § 78p(a)(1). "[D]efining directors, officers, and [such] beneficial owners as those presumed to have access to inside information," Foremost-McKesson, Inc. v. Provident Securities Co., 423 U.S. 232, 243 (1976) ("Foremost-McKesson"), Congress enacted § 16(b) of the Act, which provides, in pertinent part, as follows:

> **(b) Profits from purchase and sale of security within six months.** For the purpose of preventing the unfair use of information which may have been

obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security . . . purchased or of not repurchasing the security . . . sold for a period exceeding six months. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security . . . .

15 U.S.C. § 78p(b).

The general purpose of Congress in enacting § 16(b) is well known. See Kern County Land Co.[ v. Occidental Petroleum Corp., 411 U.S. 582, 591-92 (1973)]; Reliance Electric Co. [v. Emerson Electric Co., 404 U.S. 418, 422 (1972)], and the authorities cited therein. Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors. In § 16(b) Congress sought to "curb the evils of insider trading [by] . . . . taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great." Reliance Electric Co., supra, at 422.

Foremost-McKesson, 423 U.S. at 243 (emphasis added).

Profits resulting from purchase-and-sale, or sale-and-repurchase, transactions within a period of less than six months are commonly known as "short-swing" transactions, see, e.g., id. at 234; SEC Rule 16a-1(a)(3), 17 C.F.R. § 240.16a-1(a)(3). As indicated by the "irrespective of any intention" clause in § 16(b), that section is a strict-liability provision; it "requires the inside, short-swing trader to disgorge all profits realized on all

-14-

'purchases' and 'sales' within the [six-month] period, <u>without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information</u>," <u>Kern County Land Co. v. Occidental Petroleum Corp.</u>, 411 U.S. 582, 595 (1973) (emphasis added); <u>see</u>, <u>e.g.</u>, <u>Foremost-McKesson</u>, 423 U.S. at 251 ("Section 16(b) imposes a strict prophylactic rule with respect to insider, short-swing trading.").

The Exchange Act also recognizes that the abuses it targets may be accomplished by persons acting not individually but in combination with others. <u>See</u>, <u>e.g.</u>, 15 U.S.C. § 78m(d)(3). With respect to § 16, SEC Rule 16a-1(a)(1) provides that, "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities," the term "beneficial owner" means, with exceptions not pertinent here, "any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." 17 C.F.R. § 240.16a-1(a)(1). Section 13(d) of the Act provides, in pertinent part, that

> <u>[w]hen two or more persons act as a</u> partnership, limited partnership, syndicate, or other <u>group for the purpose of acquiring, holding, or disposing of securities of an issuer</u>, <u>such</u> syndicate or <u>group shall be deemed a "person" for the purposes of this subsection</u>.

15 U.S.C. § 78m(d)(3) (emphases added). And SEC Rule 13d-5(b)(1) promulgated thereunder provides, with exceptions not pertinent here, that

> [w]hen two or more persons agree to act together <u>for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership</u>, for purposes of sections 13(d) and (g) of the Act, as of the date of

> such agreement, <u>of all equity securities of that issuer beneficially owned by any such persons</u>.

17 C.F.R. § 240.13d-5(b)(1) (emphases added).  Accordingly, under § 13(d)(3) and this Rule, if two or more entities agree to act together for any of the listed purposes, a "group" is "thereby" formed.

Thus, "the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." <u>Wellman v. Dickinson</u>, 682 F.2d 355, 363 (2d Cir. 1982) ("<u>Wellman</u>"), <u>cert. denied</u>, 460 U.S. 1069 (1983).  Although a common purpose to acquire control of the issuing company would be an indicium of collective action within the meaning of § 13(d), it is not an essential.

> [T]he agreement required by § 13(d)(3) need not be an agreement to gain corporate control or to influence corporate affairs. . . .  The plain language of § 13(d)(3) demands only an agreement "for the purpose of acquiring, holding, or disposing of securities," 15 U.S.C. § 78m(d)(3), and Rule 13d-5 is similarly satisfied by that sort of agreement, 17 C.F.R. § 240.13d-5(b)(1).

<u>Morales v. Quintel Entertainment, Inc.</u>, 249 F.3d 115, 124-25 (2d Cir. 2001).  Further, evidence that group members "might not always make identical investment decisions" does "not preclude existence of agreement." <u>Id</u>. at 127 (internal quotation marks omitted).

Importantly, for purposes of this case, the actors need not have combined for all of the purposes listed in § 13(d)(3) or Rule 13d-5(b)(1).  Acquiring, holding, and disposing of are listed in the disjunctive.  Hence, "[a]ll that is required is that the members of the group have combined to further a common objective with regard to <u>one</u> of those activities." <u>Morales v. Freund</u>, 163

F.3d 763, 767 n.5 (2d Cir. 1999) (emphasis added); see, e.g., Morales v. Quintel Entertainment, Inc., 249 F.3d at 124; Wellman, 682 F.2d at 363.

The questions of (a) whether two or more persons "act[ed]" as a group or agreed to act together, and (b) whether their purpose was the acquisition, holding, or disposition of an issuer's equity securities are questions of fact. See, e.g., Morales v. Quintel Entertainment, Inc., 249 F.3d at 124. If they in fact so acted or agreed to so act, the legal consequences are specified in § 13(d)(3) and Rule 13d-5(b)(1): If the persons agreed to act together for the purpose of purchasing an issuer's shares, a "group" was "thereby" formed, 17 C.F.R. § 240.13d-5(b)(1); if they acted as a "group," they must be treated as a single person, 15 U.S.C. § 78m(d)(3) ("shall be deemed a 'person'"); and each person in the group "shall be deemed" to be the beneficial owner "of all equity securities of that issuer beneficially owned by any" member of the group, 17 C.F.R. § 240.13d-5(b)(1).

An agreement to act together for the purpose of acquiring, holding, or disposing of shares need not be unconditional in order to support a finding that the actors constituted a group within the meaning of those provisions. See, e.g., Wellman, 682 F.2d at 363. Nor need the group "be committed to acquisition, holding, or disposition on any specific set of terms." Id.; see, e.g., Morales v. Freund, 163 F.3d at 767 n.5. And, "[o]f course, the concerted action of the group's members need not be expressly memorialized in writing." Wellman, 682 F.2d at 363. The formation of such a group "may be formal or informal and may be proved by direct or

circumstantial evidence." Morales v. Quintel Entertainment, Inc., 249 F.3d at 124; see also id. at 125-26 (sworn statements by defendants, alleged group members, that the members "never 'agreed' among themselves to acquire [the] stock" are insufficient to support the granting of summary judgment in favor of the defendants where there is circumstantial evidence from which "a reasonable trier of fact could discredit the . . . sworn statements and infer instead that" the defendants entered into an agreement with one another, "with an agreed purpose to acquire [the] stock").

B.  Rule 12(b)(6)

In considering a motion under Fed. R. Civ. P. 12(b)(6) to dismiss a complaint for failure to state a claim on which relief can be granted, the district court is normally required to look only to the allegations on the face of the complaint. If, on such a motion, "matters outside the pleading are presented to and not excluded by the court," the court should normally treat the motion as one for summary judgment pursuant to Fed. R. Civ. P. 56. Fed. R. Civ. P. 12(b); see, e.g., Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 154-55 (2d Cir. 2006) ("Global"). In any event, a ruling on a motion for dismissal pursuant to Rule 12(b)(6) is not an occasion for the court to make findings of fact. See, e.g., Leonard F. v. Israel Discount Bank of New York, 199 F.3d 99, 107 (2d Cir. 1999).

In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint

or incorporated in it by reference are deemed part of the pleading and may be considered. See, e.g., Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998), cert. denied, 525 U.S. 1103 (1999). In addition, even if not attached or incorporated by reference, a document "upon which [the complaint] solely relies and which is integral to the complaint" may be considered by the court in ruling on such a motion. Cortec Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991) ("Cortec") (emphases added), cert. denied, 503 U.S. 960 (1992); see, e.g., Global, 458 F.3d at 156.

This principle has its greatest applicability in cases alleging fraud. See, e.g., Cortec, 949 F.2d at 47-48; Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991) ("Kramer"). When a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document to see whether or not those facts were disclosed. See, e.g., id. Or when the complaint alleges that such a document made a particular representation, the court may properly look at the document to see whether that representation was made. See, e.g., id. at 775. Consideration of such documents filed with the SEC is appropriate with respect to a nondisclosure or misrepresentation claim because "no serious question as to their authenticity can exist," and because the court is to consider them on a Rule 12(b)(6) motion "only to determine what the documents stated," and "not to prove the truth of their contents." Kramer, 937 F.2d at 774 (emphases added).

Similarly, where public records that are integral to a

fraud complaint are not attached to it, the court, in considering a Rule 12(b)(6) motion, is permitted to take judicial notice of those records. See, e.g., id.; Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993). If the court takes judicial notice, it does so in order "to determine what statements [they] contained"--but "again not for the truth of the matters asserted." Kramer, 937 F.2d at 774 (emphases added); see, e.g., Liberty Mutual Insurance Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir. 1992).

A decision that a complaint fails to state a claim on which relief can be granted is a ruling of law, see, e.g., De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir.), cert. denied, 519 U.S. 1007 (1996); McCall v. Pataki, 232 F.3d 321, 322 (2d Cir. 2000), and we review such a decision de novo, see, e.g., Gregory v. Daly, 243 F.3d 687, 691 (2d Cir. 2001). In our review, we, like the district court, "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." Id. (internal quotation marks omitted). And whatever documents may properly be considered in connection with the Rule 12(b)(6) motion, the bottom-line principle is that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic Corp. v. Twombly, 2007 WL 1461066, at *11 (U.S. May 21, 2007) ("Twombly").

C. The Claim Against Jennings

   1. Sufficiency of the Allegation of "Group" Action

Because Jennings apparently owned no MMI stock just prior to the May 2003 purchases he made with the loan from EMR, he was not a statutory insider to whom § 16 applied unless he and EMR--which already owned 14.8 percent--acted as a group for the purpose of Jennings's acquisition, holding, or disposition of MMI shares. The district court, in ruling that the complaint did not sufficiently allege that EMR and Jennings had acted as a group, did not properly apply the above principles.

The district court correctly noted that SEC filings may properly be considered in ruling on a Rule 12(b)(6) motion to dismiss a complaint alleging claims of fraud. But this is not a fraud case. It is, rather, a § 16(b) action seeking the disgorgement of short-swing profits, for which an insider is to be held strictly liable. Defendants' submissions of their Schedule 13D filings thus presented material that was inappropriate for consideration on Rule 12(b)(6) motions to dismiss a § 16(b) complaint that contained no allegation of a failure to disclose or of a factual misrepresentation.

Further, even if there had been allegations of fraud, defendants' SEC filings could not properly be considered for the truth of their contents. The district court's view that "the Defendants' statements, which have been submitted to a government agency and made public, should not be contradicted or taken as perjurious simply because the Plaintiff, without evidence, says they are," District Court Opinion, 2006 WL 278135, at *5--although a

possible argument to a jury--was not an appropriate rationale for ruling on a motion under Rule 12(b)(6).

The cases cited by the district court for the proposition that "if a plaintiff's allegations are contradicted by a document considered in determining a Rule 12(b)(6) motion, those allegations are insufficient to defeat the motion," id. (citing Matusovsky v. Merrill Lynch, 186 F.Supp.2d 397, 400 (S.D.N.Y. 2002)) (emphases ours), i.e., that "when documents contain statements that contradict the allegations in the complaint, the documents control and the court need not accept as true the allegations contained in the complaint," District Court Opinion, 2006 WL 278135, at *5 (citing Rapoport v. Asia Electronics Holding Co., 88 F.Supp.2d 179, 184 (S.D.N.Y. 2000)) (emphasis ours), are not applicable to the present case. Matusovsky was a case in which the plaintiff claimed that a general release he had signed was without consideration, whereas the signed release itself recited the consideration he received; and the cited discussion in Rapoport concerned a fraud claim alleging that a prospectus failed to disclose certain facts. These cases fall squarely within the principle that the contents of the document are controlling where a plaintiff has alleged that the document contains, or does not contain, certain statements. As we noted in Kramer, however, such documents may properly be considered only for "what" they contain, "not to prove the truth" of their contents.

In the present case, the gravamen of the complaint was simply that defendants were subject to strict liability for Jennings's profits on his short-swing transactions as members of a group that owned more than 10 percent of MMI's shares. The district

-22-

court's ruling that the complaint failed to state a claim that EMR and Jennings constituted a group because of defendants' "disclaimer[s] of group status" in their Schedule 13D filings with the SEC, District Court Opinion, 2006 WL 278135, at *5, was flawed for several reasons. First, it improperly considered the representations in defendants' filings for the truth of their assertions that there were no current agreements or understandings between Jennings and EMR as to how Jennings would vote or dispose of his shares in the future. Even assuming that those factual assertions were relevant, they raised issues of fact that should not have been determined at the pleading stage.

Second, the court apparently assumed that defendants' representations, which used the present tense as to their current understandings with respect to Jennings's future obligations, also meant that they had had no past understanding, when EMR made the loan to Jennings, that the purpose of the loan was to fund his purchase of MMI shares. The Schedule 13D filings did not, however, actually state that there had not been such an agreement with regard to Jennings's acquisition of the shares. For example, EMR's June 9 Schedule 13D acknowledged that Jennings had used the loan to fund his May 29-30 purchases of MMI shares and stated that EMR "has" no understanding with respect to the MMI shares "owned" by Jennings. Jennings's June 9 Schedule 13D made similar use of the present tense, stating there "are" no agreements as to how he would use the proceeds of the EMR loan. Thus, even if it had been appropriate to consider defendants' SEC filings for the truth of their assertions, their representations would not have warranted rulings in their

-23-

favor, for they did not actually assert that EMR had not agreed to make the loan to Jennings for the purpose of the MMI stock acquisition.

Third, in disclaiming "group" status, defendants were in effect attempting to disclaim the legal effects of their conduct. The district court's acceptance of and reliance on defendants' "express[] state[ment]s that Jennings and EMR are in no way, either by the loan of June 9, 2003 or at any time in the future, to be considered a 'group,'" as a disclaimer that was "control[ling]," District Court Opinion, 2006 WL 278135, at *5, gave no recognition to the terms of § 13(d)(3) and Rule 13d-5(b)(1). If in fact EMR and Jennings acted together for the purpose of Jennings's acquiring MMI shares, EMR and Jennings "thereby," under those provisions of law, "formed" a "group," regardless of their attempted disclaimers of the legal effect of such joint action.

Finally, looking at the "group" allegations in the complaint, i.e., that EMR's loan to Jennings was made for the purpose of allowing him to buy MMI shares in furtherance of an EMR-Jennings agreement "to work together to effect a change of control or similar transaction involving MMI" (Complaint ¶ 8), and at the documents to which the complaint referred, we cannot agree with the district court's view that the "group" allegations were "unmitigated speculation" or "unadorned" allegations made "without evidence," District Court Opinion, 2006 WL 278135, at *5 (internal quotation marks omitted). Leaving aside the principle that "[t]he pleading of additional evidence," beyond what is required to enable the defendant to respond, "is not only unnecessary, but in contravention

- 24-

of proper pleading procedure," Geisler v. Petrocelli, 616 F.2d 636, 640 (2d Cir. 1980); see, e.g., 2A Moore's Federal Practice -- Civil § 8.04[1][b][5] (3d ed. 2007), the complaint's allegation of collaboration between EMR and Jennings was hardly "unadorned" or an "unmitigated speculation." That allegation was accompanied by other allegations, and by references to defendants' respective June 2003 Schedule 13D filings, that included the following:

- On May 21, 2003, EMR completed its accumulation of 1,503,100 shares of MMI's stock, or 14.8 percent of the outstanding shares (see Complaint ¶ 13; EMR Schedule 13D dated June 2, 2003, at 2, 5).

- In connection with its May 2003 purchases, EMR stated that it might "seek to change or influence control of" MMI by, inter alia, "waging a proxy contest for control of the Company" (EMR Schedule 13D dated June 2, 2003, at 4).

- On May 29 and 30, 2003, Jennings, in open-market purchases, acquired 842,000 shares of MMI's stock (see Complaint ¶ 9), which constituted 8.3 percent of MMI's stock (see Jennings Schedule 13D dated June 9, 2003, at 2).

- Jennings paid for his May 29-30 purchases with a $10 million loan from EMR (see Complaint ¶ 8).

- The rate of interest on EMR's loan to Jennings, according to the Loan Agreement, was 4 percent per annum (which we judicially notice was below the then-current prime rate, see, e.g., Wall Street Journal, Nov. 8, 2002, at C12 (prime rate 4.25%); id. June 27, 2003, at C11, and June 30, 2003, at C15 (prime rate cut from 4.25% to 4.00% effective June 27, 2003)).

- EMR's $10 million loan to Jennings was unsecured (see Jennings Schedule 13D dated June 9, 2003, Exhibit A; EMR Schedule 13D dated June 9, 2003, Exhibit I).

Although we do not suggest that Roth was required to adduce such evidence at the pleading stage, see, e.g., Twombly, 2007 WL 1461066, at *8 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"), we note

that on this record, no rational factfinder would be compelled to believe that EMR and Jennings had had no agreement with respect to Jennings's acquisition of his shares. Given evidence that EMR acquired a 14.8 percent stake in MMI and stated that it might attempt to gain control of MMI, that within days of its acquisition of that 14.8 percent EMR made a cheap and unsecured loan of $10 million to Jennings, that Jennings was MMI's former chairman and CEO, and that Jennings used the EMR loan to acquire 8.3 percent of MMI's stock, a rational factfinder could instead easily infer that EMR and Jennings acted together for the purpose of Jennings's purchase of shares in MMI. And upon such a finding, § 13(d)(3) and Rule 13d-5(b)(1) would require that EMR and Jennings be treated as a group, with each being deemed to own the total of their holdings of MMI stock.

In sum, the district court erred in accepting defendants' SEC filings for the truth of their contents, in inferring that those contents were sufficient and controlling, and in concluding that the complaint itself did not allege facts sufficient to show that EMR and Jennings constituted a group, within the meaning of the Exchange Act, for the purpose of having Jennings purchase shares of MMI.

### 2. The Duration of the Group

The remaining question is whether the complaint was nonetheless properly dismissed on the ground that § 16(b) was inapplicable because EMR and Jennings were no longer a "group"--on the theory that their interests had diverged--when Jennings sold his shares. The district court answered this question in the

affirmative. Because the final sentence of § 16(b) states that

> [t]his subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security,

15 U.S.C. § 78p(b) (the "exemptive provision"), the court reasoned that two or more persons are not to be considered a group unless they pursued a common purpose in selling the issuer's stock, see District Court Opinion, 2006 WL 278135, at *5-*6. In light of the language of § 13(d)(3) and Rule 13d-5(b)(1), and the purpose of § 16(b), we disagree with this interpretation.

As discussed in Part II.A. above, the stated purpose of § 16(b) is "preventing the unfair use of information which may have been obtained by [an insider] by reason of his relationship to the issuer," 15 U.S.C. § 78p(b). Section 16(b) itself contains no provision as to who is an insider. The provisions delineating who is an insider by reason of size of stock ownership are §§ 16(a) and 13(d) of the Act and SEC Rules 16a-1(a)(1) and 13d-5(b)(1). Thus, § 16(a) of the Act deems insiders to include any person who is directly or indirectly the beneficial owner of more than 10 percent of any class of the issuer's stock. SEC Rule 16a-1(a)(1) provides that more-than-10-percent owners include any person who is deemed a beneficial owner of more than 10 percent by reason of § 13(d) of the Act and the rules thereunder. And § 13(d)(3) and Rule 13d-5(b)(1) provide that if any two or more persons act together for the purpose of acquiring, holding, or disposing of shares of an issuer, each actor is deemed to be the beneficial owner of the total number of shares owned by all of them.

-27-

The disgorgement provision of § 16(b) simply dictates the consequences when an insider profits from short-swing transactions. However, because § 16(b) "was designed to prevent a corporate director or officer or the beneficial owner of more than 10 per cent[] of a corporation from profiteering through short-swing securities transactions on the basis of inside information," Foremost-McKesson, 423 U.S. at 234 (internal quotation marks and footnote omitted), the exemptive provision was needed to be sure that a person who was an insider solely by reason of his beneficial ownership of more than 10 percent of the issuer's stock would be held strictly liable for short-swing profits only if he was an insider at the time of both his purchase and his sale (or sale and repurchase). If he was not an insider at both of those times, there is no presumption that he was privy to inside information at both times. Accordingly, the exemptive provision means that "in a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner [of more than 10 percent] before the purchase," id. at 250 (internal quotation marks omitted); and it means that a sale made after a former beneficial owner of more than 10 percent has already reduced his holdings to 10 percent or below is exempted from § 16(b) by the phrase "at the time of . . . sale," Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 419-20 (1972). The exemptive provision in § 16(b) does not purport to define insider status; it merely says that, for the disgorgement provision to apply, the short-swing trader must have insider status "at the time of" both of his transactions.

Under § 13(d)(3) and Rule 13d-5(b)(1), which delineate the

insider status of joint actors, if two or more persons act together for the purpose of acquiring, holding, "or" disposing of shares of an issuer, they are deemed a group, and each is deemed the beneficial owner of all the shares beneficially owned by all of the collaborators. Because the statute and the Rule list those purposes in the disjunctive, a group is formed as a matter of law if those persons act for any one of the listed purposes.

The district court thus erred in holding that "for traders to constitute a 'group', the Exchange Act requires that their coordinated activity persist during the time of purchase <u>and</u> during the time of sale of the securities," District Court Opinion, 2006 WL 278135, at *6 (emphasis in original). That ruling gave a conjunctive reading to provisions that are disjunctive.

In sum, §§ 16 and 13(d) and the rules thereunder mean that where, as alleged here, two persons acted together for the purpose of acquiring the stock of an issuer, and collectively those persons owned more than 10 percent of that stock both before any transaction leading to a short-swing profit and at the time of the matching short-swing transaction, the final sentence of § 16(b) provides them no exemption. All of the joint actors in such circumstances are deemed to be insiders and are presumed to have access to insider information.

These provisions appropriately address the Congressional concern that such short-swing sales may have been based on access to inside information. In the present case, for example, evidence of EMR's cheap, unsecured loan of $10 million to Jennings for his purchase of MMI stock, following close on the heels of EMR's own

acquisition of a 14.8 percent stake in MMI, would, as discussed above, permit an inference that EMR and Jennings acted together in order to allow Jennings to purchase his 842,000 shares in MMI, and require the legal conclusion that EMR and Jennings were thereby a group. Thus, both EMR itself, which owned 14.8 percent of MMI's stock, and Jennings as its collaborator would be presumed to have access to inside information. Jennings's decision to sell the majority of his shares on the open market could well have been based on inside information. For example, in May, EMR had purchased its 14.8 percent stake in MMI at prices below $11 a share (see EMR Schedule 13D dated June 2, 2003, at 5), and it disclosed that it might seek control of MMI through, inter alia, additional open-market purchases or a tender offer (see id. at 4). By mid-July, the market price of MMI shares had risen to more than $19 a share. (See Jennings Schedule 13D dated July 18, 2003, at 5.) However, "[o]n September 8, 2003 EMR and MMI signed a 'standstill agreement,'" District Court Opinion, 2006 WL 278135, at *3, pursuant to which MMI agreed to make certain information available to EMR and EMR agreed that it would, inter alia, neither purchase nor "make any proposal to acquire" any more MMI shares before June 15, 2004 (MMI Form 8-K dated September 9, 2003, Exhibit 10.1, at 4). Prior to the public announcement of this standstill agreement, Jennings sold thousands of his MMI shares. A shareholder in his position could well have reasoned that the imminent MMI-EMR agreement removing EMR as a potential open-market buyer of, or a potential tender offeror for, MMI shares for the better part of year made it attractive for him to sell shares before the standstill agreement was made known to the

rest of the investing public. That type of trading on the basis of advance information is the sort of conduct that Congress sought to deter by enacting § 16(b) and making short-swing profits automatically disgorgeable "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information," Kern, 411 U.S. at 595.

Thus, taking the allegations of the present complaint as true, we cannot agree with the district court's ruling that, as a matter of law, § 16(b) permits an insider--here, the owner of 14.8 percent of an issuer's stock--to fund the purchase of up to 10 percent more of such stock by an ally, and permits the ally to make profits on short-swing sales of those shares and not disgorge those profits to the issuer. We conclude that the district court's ruling is contrary to the language and intent of the Exchange Act.

Finally, even if we agreed with the district court's interpretation of § 16(b) as inapplicable unless EMR and Jennings were a "group" both at the time Jennings acquired his MMI shares and at the time he sold, we would nonetheless be constrained to vacate the dismissal of the claim against Jennings because the court, in concluding that defendants were not a group at the time of those sales, impermissibly made findings of fact. And, again without suggesting that detailed factual allegations were required at the pleading stage, we note that the present record would easily permit a rational factfinder draw to factual inferences contrary to those drawn by the court.

The district court's rationale for concluding that EMR and Jennings were not a "group" at the time Jennings sold his shares on

the open market was that EMR had offered on August 12, 2003, to buy 826,000 shares of MMI stock from Jennings, and that Jennings rejected that offer and instead sold 602,900 shares on the open market. The court found that if Jennings and EMR "held a common purpose," Jennings "likely" would have accepted EMR's offer to purchase his shares, and that "Jennings' refusal of EMR's offer contradicted precisely what one would have expected of him had he been acting in concert with EMR," District Court Opinion, 2006 WL 278135, at *5 (emphases added). What Jennings's purposes had been, what he was "likely" to have done, and what decisions he "would have [been] expected" to make, are questions of fact as to which the court should not have made findings in making its legal ruling on whether Roth had pleaded a claim that could entitle him to relief.

Moreover, the district court's assessment of the "likel[ihood]" that Jennings's interests and those of EMR were no longer aligned does not appear to take into account facts indicated by the record, even as it exists at this stage. For example, in inferring that Jennings was no longer interested in the control of MMI, the court does not appear to have taken into account the fact that the Schedule 13D filed by Jennings with respect to his sale of 602,900 shares through September 9, 2003, stated that, after those sales, Jennings still owned 423,100 shares of MMI's outstanding stock (see Jennings Schedule 13D dated September 10, 2003, at 3)--a statement forcing the mathematical inference that Jennings had acquired additional shares of MMI after his initial purchase of 842,000 shares in May and before his sale of 602,900 shares. Accordingly, the record showed that despite selling most of the

shares he had bought in May, Jennings remained the owner of a substantial block of MMI stock--approximately 4 percent. (See id.) Thus, despite the district court's surmise, Roth may well be able to prove that Jennings continued to have a control-seeking interest aligned with that of EMR.

Further, although the district court mentioned that the price at which EMR offered to buy "826,000 of the [MMI] shares" then owned by Jennings (EMR Schedule 13D dated August 12, 2003, Exhibit 1), was below the then-market price, the court did not quantify the disparity. EMR offered to buy those shares for $13.50 a share. (See id.) However, in the weeks before and after EMR's offer, MMI shares sold on the open market for more than $18 a share. (See Jennings Schedule 13D filings dated July 18, 2003, at 5, and September 10, 2003, at 6.) We cannot uphold the ruling that the complaint was legally insufficient on the basis of the court's theory that, had EMR and Jennings had a common purpose, Jennings would "likely" have sold 826,000 shares to EMR for $13.50 a share, thereby forgoing an additional profit of more than $4.50 per share--a total of more than $3.7 million.

Indeed, the fact that EMR's offering price was so much lower than the market price could allow Roth to prove that Jennings's decision to reject EMR's offer and instead make open-market sales bespoke his continued interest, rather than a loss of interest, in achieving control of MMI. Attachments to the Schedule 13D filings suggest that Jennings needed to sell at least some of his MMI shares in order to repay the loan given him by EMR. Yet, as a matter of common sense, it seems likely that the more MMI stock

Jennings owned, the greater his chances of sharing in MMI's control. The total price that EMR offered for 826,000 shares, at $13.50 per share, was little more than the gross amount that Jennings received, according to his September 10, 2003 Schedule 13D, for selling just 602,900 shares on the open market. Thus, by selling 602,900 shares on the open market, Jennings grossed roughly the same amount of money, but he was able to keep 223,100 shares of MMI stock, or more than 2 percent of its outstanding shares, that he otherwise would have lost. The district court's inference that Jennings's sale of 826,000 shares to EMR was "what one would have expected" if Jennings wished to share in the control of MMI was thus questionable and certainly was not a proper basis for a Rule 12(b)(6) dismissal.

In sum, even if the disgorgement provision of § 16(b) were inapplicable unless EMR and Jennings had a common purpose at the time Jennings sold his shares, the complaint should not have been dismissed on the premise that Roth could not show such a purpose.

D.   The Claim Against EMR

The district court dismissed Roth's claim against EMR on the alternative ground that the complaint did not allege either that EMR had engaged in any short-swing transactions in MMI securities or that EMR had received, directly or indirectly, any profit from the sale of Jennings's shares. Roth contends that the district court also erred in dismissing his claim against EMR on this ground. We disagree.

Section 16(b) requires an insider to disgorge "'any profit realized by him' from short-swing transactions." Blau v. Lehman,

- 34-

368 U.S. 403, 414 (1962) (quoting § 16(b)) (emphasis in Blau). Roth "concedes that the complaint does not specifically allege that EMR has a pecuniary interest in any of Jennings' profits" (Roth reply brief on appeal at 10); but he argues that the "highly unusual transaction by which EMR financed Jennings' trades in MM[I] stock, followed by a merger offer, certainly gives rise to a presumption that EMR derived some pecuniary benefit from Jennings' purchases and sales" (Roth brief on appeal at 28 (emphasis added)). It may well be that EMR improved its prospects for an eventual merger by funding Jennings's purchases of MMI shares. But what is required for the imposition of strict liability on EMR is that EMR itself have realized profits from short-swing transactions. No such "presumption" (id.) arises from EMR's loan to Jennings; and no such allegation appears in the complaint. The complaint's assertion that "[e]ach member of the Group is liable to the extent of its [sic] pecuniary [interest] in the foregoing disgorgeable profits" (Complaint ¶ 18 (emphasis added)) does not constitute an allegation that EMR in fact realized any such profits.

Nor does Roth suggest that he should have been given leave to file an amended complaint in order to allege that EMR shared in Jennings's short-swing profits. Rather, urging that he should have been given an opportunity for discovery (Roth brief on appeal at 28), Roth asks, "Is it not possible, maybe even probable, that there was some understanding between Jennings and EMR that was not revealed in the SEC filings?" (Roth reply brief on appeal at 11 (emphases added)). This is a far cry from any suggestion that Roth would be able to file a pleading consistent with the Rule 11

requirement that a complaint's factual assertions "have evidentiary support or, if specifically so identified, are <u>likely</u> to have evidentiary support after a reasonable opportunity for further investigation or discovery," Fed. R. Civ. P. 11(b)(3) (emphasis added).

"[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." <u>Twombly</u>, 2007 WL 1461066, at *9 (internal quotation marks omitted). The allegations of Roth's complaint, taken as true, show no basis for entitlement to relief against EMR.

## CONCLUSION

We have considered all of the parties' contentions on this appeal and, except as indicated above, have found them to be without merit. So much of the judgment as dismissed the complaint against EMR is affirmed. So much of the judgment as dismissed the complaint against Jennings is vacated, and the matter is remanded for further proceedings with respect to the claim against him.