10-4591-cv
Anderson News, L.L.C. v. American Media, Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued:  October 19, 2011                                    Decided: April 3, 2012)

Docket No. 10-4591-cv

_____

ANDERSON NEWS, L.L.C., LLOYD T. WHITAKER, as the Assignee under an
Assignment for the Benefit of Creditors for Anderson Services, L.L.C.,

                                    Plaintiffs-Appellants,

                                    - v. -

AMERICAN MEDIA, INC., BAUER PUBLISHING CO., LP., CURTIS
CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE
FILIPACCHI MEDIA, U.S., HUDSON NEWS DISTRIBUTORS LLC, KABLE
DISTRIBUTION SERVICES, INC., RODALE, INC., TIME INC.,
TIME/WARNER RETAIL SALES & MARKETING, INC.,
                                    Defendants-Appellees,

THE NEWS GROUP, LP,
                                    Defendant.
_____

Before:  KEARSE, LEVAL, and CHIN, Circuit Judges.

                Appeal from a judgment of the United States District Court for the Southern District

of New York, Paul A. Crotty, Judge, granting defendants' motion to dismiss for failure to state a claim

under § 1 of the Sherman Act, 15 U.S.C. § 1, and denying leave to file an amended complaint.  See

732 F.Supp.2d 389 (2010).

                Vacated and Remanded.

MICHAEL K. KELLOGG, Washington D.C. (Aaron M. Panner, Kellogg, Huber, Hansen, Todd, Evans & Figel, Washington D.C., Marc Rowin, Thomas P. Lynch, Lynch, Rowin, New York, New York, Marc E. Kasowitz, Kasowitz, Benson, Torres & Friedman, New York, New York, on the brief), for Plaintiffs-Appellants.

DAVID G. KEYKO, New York, New York (Pillsbury Winthrop Shaw Pittman, New York, New York, on the brief), for Defendants-Appellees American Media, Inc., and Distribution Services, Inc.

BARRY J. BRETT, New York, New York (Daniel N. Anziska, Troutman Sanders, New York, New York, on the brief), for Defendant-Appellee Bauer Publishing Co., LP.

DECHERT, New York, New York (George G. Gordon, Joseph F. Donley, New York, New York, of counsel), submitted a brief for Defendant-Appellee Curtis Circulation Company.

JONES DAY, New York, New York (Meir Feder, D. Theodore Rave, of counsel), submitted a brief for Defendant-Appellee Hachette Filipacchi Media U.S., Inc.

GIBSON DUNN & CRUTCHER, Washington, D.C. (D. Jarrett Arp, Cynthia E. Richman, of counsel), submitted a brief for Defendant-Appellee Hudson News Distributors L.L.C.

MCELROY, DEUTSCH, MULVANEY & CARPENTER, New York, New York (I. Michael Bayda, Jay A. Katz, of counsel), submitted a brief for Defendant-Appellee Kable Distribution Services, Inc.

WINSTON & STRAWN, New York, New York (John M. Hadlock, of counsel), submitted a brief for Defendant-Appellee Rodale, Inc.

ROWAN D. WILSON, New York, New York (Thomas G. Rafferty, Margaret E. Lynaugh, Cravath, Swaine & Moore, New York, New York, on the brief), for Defendants-Appellees Time Inc. and Time/Warner Retail Sales & Marketing, Inc.

KEARSE, Circuit Judge:

Plaintiffs Anderson News, L.L.C., and Lloyd T. Whitaker, as assignee for the benefit of creditors for Anderson Services, L.L.C. (collectively "Anderson"), appeal (1) from a judgment of the United States District Court for the Southern District of New York, Paul A. Crotty, Judge, dismissing their complaint alleging that defendants-appellees, who were suppliers and business competitors of Anderson, conspired to drive Anderson out of business, in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and New York law, and (2) from an order denying Anderson's motion for reconsideration and for leave to file a proposed amended complaint. The district court granted the motions of defendants-appellees ("defendants") to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim on which relief can be granted, and denied reconsideration, ruling that the alleged conspiracy was facially implausible under the standards set by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ("Twombly"), and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) ("Iqbal"); the court denied Anderson's request for permission to file an amended complaint, ruling that the defects in the original complaint were incurable and that the proposed new complaint added only allegations that were conclusory. On appeal, Anderson contends principally that its complaint contained sufficient factual allegations to plead an antitrust violation under the standards set by Twombly and Iqbal, and that it should have been allowed to file its proposed amended complaint which contained additional factual allegations. We conclude that even if the original complaint did not meet the Twombly/Iqbal standard, Anderson's proposed amended complaint, which contains additional factual allegations, meets that standard and should have been allowed. Accordingly, we vacate the judgment of dismissal and remand for further proceedings.

3

# I. BACKGROUND

The present action involves the single-copy magazine industry, i.e., the business of selling magazines for purchase by consumers at retail outlets such as newsstands, bookstores, and mass merchandise retailers, as contrasted with the subscription-sales industry which involves shipping magazines directly to consumers. The following description of the single-copy magazine industry (or "magazine industry") and the events leading to this litigation is taken principally from Anderson's original complaint ("Complaint") and/or from its proposed amended complaint (or "PAC"), taking as true all material factual "allegations of the . . . complaint and proposed . . . amended complaint," and "draw[ing] all reasonable inferences and resolv[ing] all conflicts and ambiguities in favor of plaintiffs," Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 85 n.1 (2d Cir. 2011).

## A. The Parties

Anderson, whose creditors forced it into bankruptcy liquidation proceedings in March 2009, had been a wholesaler in the magazine industry since 1917. Wholesalers are responsible for, inter alia, the delivery of magazines to retailers. As a wholesaler, Anderson purchased magazines from their respective publishers at prices in the range of 50-60 percent of the cover prices and resold the magazines to retailers at 70-80 percent of the cover prices. (See Complaint ¶ 30; PAC ¶ 33.) Prior to February 2009, Anderson had become the second largest magazine wholesaler in the United States, with a 27-percent market share, servicing 30,000 retail customer locations in 37 states. (See Complaint ¶¶ 19, 30; PAC ¶¶ 22, 37.)

The 10 defendants are, principally, national magazine publishers and their distribution representatives. The five magazine publisher defendants are:

4

American Media, Inc. ("AMI"), the fourth largest publisher of consumer magazines, including six of the 15 best-selling weekly newsstand magazines;

Bauer Publishing Co. ("Bauer"), the largest publisher of newsstand magazines;

Hachette Filipacchi Media, U.S. ("Hachette"), publisher of, inter alia, HOME, Car and Driver, Road and Track, Popular Photography, Woman's Day, and ELLE;

Rodale, Inc. ("Rodale"), publisher of, inter alia, Prevention, Men's Health, Women's Health, and Runner's World; and

Time, Inc. ("Time"), the largest publisher of magazines overall in the United States, publishing more than 120 magazines including Time, People, Sports Illustrated, Golf, Fortune, and Money.

Approximately 80 percent of the magazines distributed by Anderson were published by the defendant publishers. (See, e.g., Complaint ¶ 64; PAC ¶ 84.)

The so-called "distributor[]" defendants are companies that "perform no physical distribution activities like warehousing, order assembly, delivery or in-store merchandising" (PAC ¶ 16) but rather are retained by publishers to, inter alia, broker and manage the publishers' relationships with wholesalers (see, e.g., Complaint ¶ 13; PAC ¶ 16). The four distributor defendants are:

Distribution Services, Inc. ("DSI"), a subsidiary of AMI that provides marketing services to publishers, including AMI, Bauer, Hachette, and Rodale;

Curtis Circulation Co. ("Curtis"), an affiliate of Hachette; the largest national magazine distributor in the United States by volume, representing at least 400 publishers, including Hachette, Rodale, and AMI, with respect to hundreds of national titles;

Kable Distribution Services, Inc. ("Kable"), the second largest national distributor in the United States, representing more than 250 publishers, including Bauer, with respect to more than 650 magazines, annuals, and digests; and

Time/Warner Retail Sales & Marketing, Inc. ("TWR"), a national magazine distributor whose clients include Time, its corporate parent.

Curtis, Kable, and TWR, along with non-party Comag Marketing Group LLC ("Comag"), are the four national distributors in the United States.

The remaining defendant, Hudson News Distributors LLC ("Hudson"), is a major wholesaler. In 2008, four wholesalers accounted for 90 percent of single-copy magazine distribution: Hudson, with a market share of 11 percent; The News Group, LP ("News Group"), with 21 percent; Anderson with 27 percent; and Source Interlink Distribution, L.L.C. ("Source"), with 31 percent. (See Complaint ¶ 30; PAC ¶ 37.) News Group was originally named a defendant in this action but was shortly dismissed as part of a settlement. (See PAC ¶ 25.) The Complaint alleged that Source, like Anderson, was a target of defendants' alleged conspiracy, which aimed to eliminate the two largest magazine wholesalers; Source, however, obtained a restraining order, and after "defendants produced documents in discovery, they agreed to enter into settlements with Source for the multi-year supply of magazines." (PAC ¶ 26.)

B. The Single-Copy Magazine Sales Industry

Magazine wholesalers are responsible not only for delivering the magazines to retailers but also for thereafter picking up from the retailers, tabulating, and destroying any copies that remain unsold. (See, e.g., Complaint ¶¶ 29-30; PAC ¶ 33.) However, publishers have an incentive to see that each retailer is overstocked, in order to ensure maximum sales and thereby maximize advertising revenues (see, e.g., Complaint ¶ 31; PAC ¶¶ 34, 41); "[i]ndeed, nearly half of all newsstand magazine titles have a 'sell-through' percentage as low as 80%--meaning that, of five magazines distributed by the wholesaler, only one is actually sold to a consumer" (PAC ¶ 41). The cost of such overstocking is borne not by the publishers that desire it, however, but rather by the wholesalers, for wholesalers historically have been compensated only for the copies that retailers actually sold. (See, e.g., id.)

6

Thus, when only one of five copies distributed is sold to a consumer, the wholesaler must bear the expense of retrieving the four unsold copies and transporting them back to its facilities for disposal or destruction, while being paid for only the one sold copy.

Accordingly, Anderson and Source had advocated adoption of a different system, under which the retailers would automatically report their sales to the publishers through use of electronic checkout scanners, dubbed "scan-based trading," and the retailers themselves would destroy all magazines they had not sold. Wholesalers would thereby be spared the unreimbursed cost of picking up, counting, reporting, and destroying unsold copies. (See, e.g., Complaint ¶¶ 32-33; PAC ¶ 42.) Publishers, however, opposed scan-based trading, citing fears of mistaken underreporting of sales due to machine error (estimated to be some five percent of all sales); underreporting would negatively affect the publishers' revenues from both sales and advertising. (See, e.g., Complaint ¶ 34; PAC ¶ 43.)

In early January 2009, Anderson decided that it would announce the imposition on publishers, as of February 1, 2009, of a $.07 distribution surcharge (the "Surcharge") for each magazine copy Anderson received and distributed, regardless of whether the retailer sold the copy. (See Complaint ¶ 39; PAC ¶ 49.) Some paragraphs of Anderson's Complaint and proposed amended complaint allege that the Surcharge was "a temporary, stop-gap measure" (Complaint ¶ 39; PAC ¶ 49) and characterize it as a "proposed . . . surcharge" (e.g., Complaint ¶ 40 (emphasis added); PAC ¶ 50 (emphasis added)); and the proposed amended complaint asserts that the Surcharge was "not . . . non-negotiable" (PAC ¶ 51; see also id. ¶ 4 ("As defendants well know, the proposed surcharge itself was negotiable.")). However, other paragraphs of the Complaint (unlike the PAC) cast the Surcharge in a more intractable light. For example, the Complaint alleged that on January 12 and 13 Charles Anderson, Anderson's chief executive officer ("CEO"), met with some of its largest publisher clients,

7

including Time, AMI, and Bauer, and "informed the publishers of <u>Anderson's decision to impose</u> the $.07 per copy surcharge." (Complaint ¶ 41 (emphasis added); <u>compare</u> <u>id</u>. <u>with</u> PAC ¶ 51 (substituting "proposed temporary stop-gap measure" for "decision to impose the $.07 per copy surcharge").) And the Complaint alleged that on "January 14, 2009, Mr. Anderson had a call-in interview with the representative of an industry publication, <u>The New Single Copy</u>, during which he publicly announced the surcharge and explained the industry constraints <u>compelling</u> that measure." (Complaint ¶ 42 (emphasis added); <u>compare</u> <u>id</u>. <u>with</u> PAC ¶ 52 (substituting "underlying" for "compelling").)

C. <u>The Alleged Conspiracy</u>

Anderson alleged that shortly after the mid-January announcement of its $.07 Surcharge, Source announced that Source too would impose a $.07-per-distributed-copy surcharge on publishers (<u>see</u> Complaint ¶ 50; PAC ¶ 54), and that defendants decided to attempt to eliminate Anderson or Source, or both, as wholesalers. It alleged that on at least two occasions in late January, defendants invited Anderson to join their effort to eliminate Source. Thus, Michael Duloc, Kable's president and CEO, in a telephone call with Frank Stockard, Anderson's president, discussed offering Anderson exclusivity in certain geographic territories in exchange for Anderson's dropping its proposed Surcharge; and Robert Castardi, Curtis's president, told Charles Anderson, "in words or substance," that "[o]nce Source was excluded from the market and its business destroyed, . . . Anderson could use its regional market power to 'get all your [Anderson's] profits from the retailers,'" but, Castardi said, "'you need to let Source go out first,'" (Complaint ¶ 50; PAC ¶ 58). Anderson declined the invitations to join in the elimination of Source.

Anderson alleged that Curtis (on behalf of Hachette, Rodale, and AMI) and Kable (on behalf of Bauer), refused to enter into any legitimate substantive negotiations with Anderson. (See PAC ¶ 66.) It alleged that Comag negotiated for a modified arrangement. And it alleged that TWR, with respect to Time's magazines, met with Anderson to discuss alternatives to the Surcharge and purported to agree to adjustments in the allocation of magazine distribution expense, asking Anderson to make immediate payments on its accounts with them (see Complaint ¶¶ 52-53; PAC ¶ 65), but that "Time and TWR never had any intention of honoring their commitment to continue to work with Anderson" (PAC ¶ 69; see Complaint ¶ 55). Anderson alleged that in late January 2009, defendants met or communicated with each other--in various combinations (see, e.g., PAC ¶¶ 56, 57, 59, 60, 61, 62, 63, 66)--and agreed that each of them would reject Anderson's proposed Surcharge, would refuse any other accommodation, and would stop supplying Anderson with magazines.

Defendants understood that joint action was needed because in 2008 Curtis, the leading national magazine distributor, representing publishers of some of the most popular magazines, had tried to eliminate Anderson unilaterally and had failed. In that attempt, Curtis informed Wal-Mart, one of Anderson's major retail clients, that Curtis's publisher clients would no longer supply magazines to Anderson; Wal-Mart, preferring to use a single wholesaler to supply a given store, responded that it would continue to purchase magazines only from Anderson even if that meant not carrying the magazines of Curtis's publishers; and Curtis thus reversed course and resumed supplying Anderson. (See Complaint ¶ 45; PAC ¶ 46.) "Curtis's failed unilateral attempt to eliminate Anderson as a wholesaler confirmed to Curtis that concerted action among the major publishers and national distributors was essential to achieve" the elimination of Anderson and to force retailers to deal with wholesalers chosen by the publishers. (PAC ¶ 46; see Complaint ¶ 45.) Accordingly, the Complaint alleged,

9

throughout the latter part of January [2009] and the early days of February, defendants--ostensibly each others' competitors--held numerous meetings during which they discussed dividing the U.S. distribution territory into two regions--one controlled by Hudson and the other controlled by News Group. For example, in furtherance of their conspiracy to cut off supply to Anderson and Source, defendants Curtis and Hudson met with their respective competitors, TWR and News Group, in January 2009 at Hudson's offices in North Bergen, New Jersey.

56. Moreover, [TWR's CEO Rich] Jacobsen made clear in a conversation with Source's CEO, Greg Mays, at a February 2 dinner meeting in New York, why Source and Anderson were being terminated. When Jacobsen told Mays that TWR would not be supplying any magazines to Source, Mays asserted to Jacobsen that with the distribution system being created by defendants, there would be no scan-based trading, the two remaining wholesalers would force reduced margins down to the retailers rather than to the publishers, and there would be absolute control over the market. Jacobsen's response, in words or substance, was: "Exactly--we now control this space."

(Complaint ¶¶ 55-56; see PAC ¶¶ 63, 81.) The Complaint alleged that

in late January, national distributor defendants Curtis, Kable, and TWR, and publisher defendants AMI, Bauer, Hachette, Rodale, and Time--acting in concert--cut off Anderson from its supply of magazines--including the most popular titles, like People and Sports Illustrated.

(Complaint ¶ 47; see, e.g., PAC ¶¶ 66-67.)

Anderson, deprived of 80 percent of the magazines it normally distributed, was forced to suspend its magazine wholesale business on February 7, 2009. (See Complaint ¶¶ 64-66; PAC ¶¶ 84-86.) On March 2, 2009, creditors of Anderson forced the company into bankruptcy liquidation proceedings.

Anderson alleged that "[d]efendants' conduct has reduced the output of magazines through the wholesale market." (Complaint ¶ 73; PAC ¶ 93.) It alleged that that conduct has "permanently reduced the choices available to retailers and their customers" (Complaint ¶ 74; PAC ¶ 94) and that in some areas "wholesale distributors were temporarily unavailable to serve retailers" (PAC ¶ 93), so that "for a significant period of time the retailers' customers had access to fewer

magazines as well" (id.). Further, the elimination of Anderson as a wholesaler allowed News Group and Hudson to increase the prices charged to approximately 80 percent of the retailers that had previously purchased magazines from Anderson. (See PAC ¶¶ 82, 95.)

Anderson commenced the present action on March 10, alleging principally that defendants' agreement to boycott Anderson violated § 1 of the Sherman Act, 15 U.S.C. § 1; it also alleged tortious interference with business relations and civil conspiracy in violation of state law. Those originally sued included News Group, which, two days after the Complaint was filed, was voluntarily dismissed in accordance with a release executed by Anderson, which had been forced to sell certain distribution assets to News Group in February 2009. The remaining defendants eventually moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint for failure to state a claim on which relief can be granted; they argued, relying principally on Twombly, that the Complaint did not set forth a plausible basis for finding a conspiracy in violation of the antitrust laws. Anderson opposed the motions, contending that the Complaint met the Twombly/Iqbal standard but requesting permission to file an amended complaint if the court disagreed.

D.  The Dismissal of the Complaint

In an opinion dated August 2, 2010, reported at 732 F.Supp.2d 389, the district court granted defendants' motions to dismiss the Complaint, see id. at 396-406. Citing the Supreme Court's decision in Twombly, the court noted that

> [a] complaint alleging an antitrust claim must set forth sufficient facts to raise a plausible suggestion that the purported parallel conduct stemmed from an agreement. . . .  Thus allegations of parallel conduct coupled with bare assertions of conspiracy are not sufficient to state a claim; rather, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement. . . . Examples of parallel conduct allegations that would suffice under this standard include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or

11

mere interdependence unaided by an advance understanding among the parties."

732 F.Supp.2d at 396 (quoting Twombly, 550 U.S. at 556 & n.4 (emphasis ours)).  The court noted that

> [a]ntitrust allegations need not be detailed with overt acts by each defendant, but must plausibly state how each defendant was involved in the alleged conspiracy. . . .  Allegations connecting defendants to the conspiracy must be viewed in light of the complaint as a whole.

732 F.Supp.2d at 396 (internal quotation marks omitted) (emphasis added).

The court concluded that Anderson's antitrust allegations did not meet Twombly's plausibility standard.

> The Complaint alleges that Defendants engaged in a broad industry-wide conspiracy.  The ultimate goal of this alleged conspiracy was to eliminate both Anderson and non-party Source, two of the four largest magazine wholesalers . . . .  This goal is not plausible.  Publishers and national distributors have an economic self-interest in more wholesalers, not fewer; more wholesalers yields greater competition, which is good for suppliers.  Destroying Anderson and Source would reduce the publisher's wholesale outlets from four to two and would give Hudson and News Group, the two remaining major wholesalers, 90% of the market share . . . .  This is too much market power to yield to wholesalers.  Indeed, the Complaint alleges that Anderson's demise has substantially reduced the output of magazines as well as the ability of retailers to obtain magazines . . . .  It is implausible that magazine publishers would conspire to deny retailers access to their own products.  Collusion to destroy Anderson and non-party Source--the ultimate goal of the alleged conspiracy--is facially implausible.

732 F.Supp.2d at 396-97 (emphases added).  Citing, inter alia, a transcript of Charles Anderson's interview with The New Single Copy's representative ("Interview Tr."), the court noted that

> [t]he Defendants[] had different reactions to Anderson's unilateral Surcharge.  That diversity compounds the implausibility of Anderson's antitrust claim.  Anderson predicates its antitrust claim on a theory of conscious parallel conduct, i.e., a pattern of uniform business conduct.  The Complaint's core parallel conduct allegation is that Defendants cut off 80% of Anderson's magazine supply . . . .  The Defendants, however, reacted differently to Anderson's Surcharge: AMI, like non-party C[omag], continued to supply magazines to Anderson and thus could not have participated in the

12

parallel conduct; Bauer and Time held a cordial meeting with Anderson and responded amicably to the Surcharge . . . ; TWR agreed to a 2% discount off the cover price of all <u>Time</u> weeklies or a 2.75% discount off the cover price for all <u>People</u> weeklies ([Interview Tr. at 2]); . . . Kable offered Anderson exclusivity in certain territories if Anderson dropped the Surcharge . . . ; and Curtis informed Mr. Anderson that he "would like to get this worked out," but that he would "have to go with whatever Rich [Jacobsen, CEO of Defendant TWR] does" . . . . <u>Conspirators hatching a concerted scheme to destroy Anderson would not have reacted so differently to the Surcharge</u>. The dramatic differences among the Defendants' reactions undermine Anderson's theory of conscious parallel conduct.

732 F.Supp.2d at 397 (footnote omitted) (emphases added).

The court further found that the Complaint did not provide a context lending itself to an inference of collusion:

Even if the Complaint plausibly alleges conscious parallel conduct, however, the Court would still grant Defendants' motion to dismiss because the Complaint fails to place the parallel conduct in a context plausibly suggesting collusion. <u>The Complaint does not contain allegations of direct evidence of a conspiracy; there are, for example, no allegations of statements by an insider informant</u>, nor are there allegations of records disclosed through a government investigation.FN9

> FN9. Rather, <u>Anderson relies on several vague statements by executives of some of the Defendants[] regarding collusion</u> (Comp. ¶¶ 49, 50, 52, 54, 56.) <u>These statements are insufficient. See below the discussion of the sufficiency of the antitrust allegations as to the Defendants individually</u>. Anderson also relies heavily on paragraph 55 of the Complaint, which alleges that "throughout the latter part of January and the early days of February" (i.e., the entire duration of the alleged conspiracy) certain <u>unnamed defendants</u> held "numerous meetings" in <u>unspecified places</u>; that (at some <u>indeterminate date</u>) Curtis, TWR, News Group, and Hudson, met at Hudson's New Jersey offices; and that during these alleged meetings, Defendants discussed dividing the U.S. distribution territory into two regions, one controlled by Defendant Hudson and the other by non-party News Group. Like the vague statements of some of the Defendants' executives, these allegations are also insufficient to plausibly suggest a prior agreement among Defendants.

> . . . .

13

The context here is that until January 14, 2010 there is no allegation of conspiracy. On that date, Anderson initiated a $.07 Surcharge on a take it or leave it basis. The demand was presented by a widely circulated trade magazine. Anderson's demand required a response. While the responses varied, ultimately the magazine publishers decided not to acquiesce to Anderson's demand. In this context, the <u>Defendants' decision to stop doing business with Anderson--the key parallel conduct allegation--does not create an inference of collusion; rather, it is "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market</u>." <u>Twombly</u>, 550 U.S. at 556, 127 S.Ct. 1955.

The context of the alleged parallel conduct is Anderson's unilateral Surcharge. The Surcharge drove Defendants' interactions with Anderson, as Anderson initially desired. Anderson publicly announced the Surcharge on January 14, 2009, and the claimed conspiracy began almost immediately thereafter, unfolding rapidly and driving Anderson out of business within weeks (¶¶ 42, 47, 66.) The Complaint recognizes the centrality of the Surcharge by highlighting it in several paragraphs (¶¶ 39-44) and presenting it as the backdrop to Defendants' alleged conspiracy: "[D]efendants saw Anderson's proposed fee as nothing short of an opportunity to eliminate Anderson as a wholesaler" (Comp. ¶ 44.)

But that characterization does not describe what happened. <u>The Defendants were not acting in a vacuum; they were reacting to Anderson's Surcharge, an added fee on all single-copy magazines</u>. Anderson presented the Surcharge as an ultimatum: the Defendants would either have to accept the Surcharge in writing or lose Anderson's services ([Interview Tr.] at 4, 10.) Definitive in his presentation of the Surcharge, Mr. Anderson recognized that the publishers would "be making decisions as to what they needed to do" ([Interview Tr.] at 5.) The magazine publishers did not acquiesce to Anderson's demands and accordingly Anderson's services were no longer available. <u>Clearly the Defendants made a business decision</u>--and one that each of the Defendants had to, and did, make quickly because of Anderson's demand. While the decision resulted in Anderson losing 80% of its supply of magazines, <u>this was unchoreographed</u> behavior, a common response to a common stimulus. . . . The Defendants responded to Anderson's unilateral demand, a negative stimulus, by pursuing similar but predictable policies to protect their business interests. <u>Unilateral parallel conduct is completely plausible in this context</u>. The parallel conduct itself does not create an inference of collusion to destroy Anderson; and the Complaint's allegations are insufficient to show that the parallel conduct was collusive.

732 F.Supp.2d at 397-99 & n.9 (emphases ours); <u>see</u> <u>id</u>. at 401 ("Anderson created a common economic stimulus, impelling an immediate market reaction. . . . Publisher[s] and distributors <u>each</u>

14

decided that, rather than accept the Surcharge, they would not do business with Anderson. Having proposed its pay-it-or else Surcharge, Anderson can not claim collusion in the Defendants' refusal to acquiesce to its self-destructive demand." (emphases added)).

The court noted Anderson's allegations that Curtis in 2008 had attempted to cut Anderson off unilaterally but had failed, and that that failure had taught the defendants that joint action was needed to boycott a major wholesaler successfully; but the court characterized those allegations as legal arguments that it found unpersuasive.

> [I]t is plausible that each of the publisher Defendants unilaterally stopped shipping magazines to Anderson rather than pay the Surcharge. Without that Surcharge, Anderson said it would not offer its distribution services. In these circumstances, Defendants conducted a cost/benefit analysis of the financial impact of payment of Anderson's Surcharge, as opposed to the business lost if their competitor publishers did not also stop shipping magazines to Anderson. Having concluded that their business interests favored rejecting Anderson's ultimatum, the magazine publishers stopped shipping magazines to Anderson, betting that their competitors would follow suit. And if that expectation was ill-founded, then the leading publisher could resume business relations with Anderson, just as Curtis did in 2008.

Id. at 400 (emphasis added). The court stated that

> [a]ccepting all non-conclusory allegations as true, Anderson alleges only that Curtis, TWR, News Group, and Hudson, met at Hudson's New Jersey offices to discuss dividing the U.S. distribution territory into two regions, one controlled by Hudson and the other by News Group . . . ; that Curtis, Kable, and TWR, Bauer, Hachette, Rodale, and Time cut off 80% of Anderson's magazine supply . . . ; that Hudson poached several of its employees during the alleged conspiracy . . . ; that Anderson was forced to lay off thousands of employees and sell its distribution-related assets to News Group at fire-sale prices . . . ; and that News Group has also succeeded in taking over Anderson's retail distribution business . . . .

732 F.Supp.2d at 402. The court concluded that these allegations presented only "an economically implausible antitrust conspiracy" theory "based on sparse parallel conduct allegations" that lacked "a context suggesting a preceding agreement." 732 F.Supp.2d at 402. The court stated that "[w]hile a court takes all factual allegations as true on a motion to dismiss, . . . factual inferences are not entitled to the same benefit." Id. (emphasis added).

The district court also found that the Complaint lacked sufficient factual allegations to permit an inference of culpability on the part of any given defendant. As to Curtis, the court found that the statements attributed to CEO Robert Castardi were "not inculpatory"; his statement that he was

> "going to have to go with whatever Rich [Jacobsen, CEO of TWR] does" . . . suggests only that he would wait to see what TWR did and that, in fact, he had no actual knowledge of Jacobsen's plans regarding Anderson. . . . Similarly, Castardi's statement to Mr. Anderson, "[Y]ou need to let Source go out first" . . . is not, as Anderson argues, an invitation to join a massive antitrust conspiracy.

732 F.Supp.2d at 402 (emphases added).

As to TWR, the court noted that the allegations of its attendance at the meeting in the Hudson offices and of the statements by TWR's CEO Jacobsen were "insufficient to plausibly allege a conspiratorial agreement," and that when Jacobsen on February 2 explained the elimination of Anderson and Source by saying, "'we now control this space'" he was merely "describing the state of the magazine industry." 732 F.Supp.2d at 402. The court found that the allegation that "when Mr. Anderson first told Jacobsen of Castardi's statements indicating that Curtis would follow TWR, Jacobsen indicated he realized Anderson knew there had been collusion" merely asked that "conspiracy [be] inferred from silence." Id. (internal quotation marks omitted)

As to Kable, the court found that, other than alleging that Kable cut off Anderson's magazine supply, the Complaint alleged only that Kable's President and CEO Michael Duloc offered Anderson exclusive distribution rights in certain territories if Anderson would drop the Surcharge. "Duloc[]'s offer does not suggest a preceding agreement; it indicates only a unilateral offer of exclusive distributorship." Id. at 403 (emphasis added).

16

As to DSI, the court found that the Complaint "does not allege that DSI engaged in any conspiratorial conduct; it alleges only that DSI is a subsidiary of AMI and a provider of sales and marketing services to publishers."  Id.

The court found that the Complaint fared no better with respect to any of the publisher defendants.  As to AMI, the court found that Anderson was collaterally estopped from asserting that AMI participated in the boycott of Anderson:

> The Court . . . takes judicial notice of an Order issued in a proceeding in Delaware Chancery Court finding that AMI continued to ship magazines to Anderson in February 2009, after the alleged boycott occurred. . . . Anderson and AMI were parties to the Delaware proceeding, triggering the doctrine of collateral estoppel. . . .  Therefore, the Court rejects Anderson's antitrust allegations as to AMI.

Id. (emphasis added).  As to the other four publisher defendants, the court stated that

> [t]he Complaint lacks specific allegations as to the publisher Defendants (Time; Bauer; Hachette; and Rodale) other than to allege that they collectively cut off Anderson from its magazine supply . . . .  Anderson attempts to implicate the publisher Defendants in the conspiracy through their relationship with the national distributor Defendants . . . .  The Complaint's allegation of an agency relationship, however, is conclusory.  Moreover, an agency relationship with the national distributor Defendants is insufficient where, as here, the Complaint fails as to the national distributor Defendants.

Id. (emphases added).

Finally, as to Hudson, the district court noted that although Anderson initially alleged that Hudson took over Anderson's distribution business, Anderson had, by letter to the court, withdrawn that assertion.  The court reasoned that as Hudson was a wholesaler, i.e., an Anderson competitor rather than supplier, Hudson could not engage in conduct that "parallel[ed]" that of the publishers or distributors, and thus, there was "no conceivable" basis for a claim by Anderson against Hudson:

17

The Complaint fails to allege parallel conduct as to Hudson. As the only magazine wholesaler Defendant, Hudson is uniquely situated. The Complaint does not allege that Hudson cut off Anderson's magazine supply; indeed, as a wholesaler, Hudson could not cut off Anderson's magazine supply. The Complaint alleges only that Hudson poached several of Anderson's employees during the alleged conspiracy . . . , and that Hudson took over Anderson's retail distribution business . . . . In a letter to the Court dated June 9, 2010, however, Anderson withdrew its allegation that Hudson has taken over Anderson's retail distribution business . . . . There is thus no conceivable role for Hudson in the alleged conspiracy. The single remaining allegation-- that Hudson poached several of Anderson's employees--is plainly insufficient to plausibly allege an antitrust claim as to Hudson.

732 F.Supp.2d at 403 (emphases added).

Having found that the Complaint provided no plausible basis for a Sherman Act claim against any defendant, the court also dismissed Anderson's state-law claims for tortious interference with business relations and civil conspiracy, concluding that the flaws with respect to its antitrust claims also meant that the state-law claims were not viable. See id. at 404-05.

The district court denied Anderson's request for permission to file an amended complaint, noting its discretion to deny such a request "where a plaintiff fails to demonstrate it could remedy the complaint's deficiencies," 732 F.Supp.2d at 405. The court found that in this case,

[t]he defects in Anderson's Complaint are not curable. The context of the alleged antitrust conspiracy--the Surcharge that Anderson tried to impose on the industry to Anderson's advantage and the disadvantage of everyone else--belies the viability of Anderson's antitrust claim. Anderson cannot deny that it decided to impose a Surcharge, and the Court must view any additional allegations of conspiratorial behavior through the lens of the Surcharge. . . . Anderson's antitrust claim . . . is based on an economically implausible theory . . . in which the Defendants merely reacted to a common and dramatic market stimulus.

The incurability of Anderson's antitrust allegations, true as to all the Defendants, is especially true as to AMI, DSI, and Hudson. AMI continued to ship magazines to Anderson and thus did not participate in the boycott of Anderson, the heart of this action. DSI cannot be held liable merely because it is a subsidiary of AMI, which is all Anderson alleges. Amending the Complaint's allegations as to Hudson would likewise be futile because there is no conceivable role for Hudson in the alleged conspiracy: as a wholesaler, Hudson could not cut off Anderson's magazine supply; and Anderson has

withdrawn its allegation that Hudson has taken over Anderson's retail distribution business.

In addition to the overall implausibility of Anderson's antitrust claim, the elimination of Hudson from the alleged conspiracy necessitates dismissal of the entire Complaint with prejudice. Anderson has argued that Hudson was critical to the conspiracy . . . . Yet because Anderson cannot allege that Hudson participated in the conspiracy, Anderson's Complaint is incurable by its own admission.

732 F.Supp.2d at 405 (emphases added).

E.    Anderson's Motion for Reconsideration and for Permission To File Its Proposed Amended Complaint

Anderson timely moved pursuant to Fed. R. Civ. P. 59(e) for reconsideration, arguing principally that, in dismissing the Complaint, the district court drew unjustified inferences and overlooked allegations of material facts. Anderson also sought reconsideration of the denial of its request for leave to file an amended complaint, and it attached the proposed amended complaint to its motion. The PAC reiterates certain allegations made in the Complaint and contains specific additional allegations as to meetings, conversations, and e-mails between or among various named individual coconspirators on or about specific dates. It includes the following allegations:

[F]our days after Anderson's public announcement of the surcharge, the presidents of the two largest national distributors, Castardi, the president of Curtis, and Michael Duloc ("Duloc"), the president and CEO of Kable, attended a meeting on Sunday, January 18, 2009 to plan their collusive action. Those two competitors represent and act on behalf of all but one of the defendant publishers: Curtis represents and acts on behalf of AMI, Hachette and Rodale; and Kable represents and acts on behalf of Bauer. The only publisher not present or represented at the Sunday meetings was defendant Time and its national distributor, TWR.

57. On January 22, 2009, however, four days after the Sunday meeting, Kable, pursuant to the conspiracy, communicated with its competitor, TWR, ostensibly to "catch up on a few" unspecified "IPDA type items." The IPDA--or International Periodical Distributors Association--is precisely the type of trade organization that has been used perennially by competitors to attempt to mask their illegal, anti-competitive communications.

58. In at least two instances during January 2009, after Source had also proposed a $.07 surcharge, certain defendants invited Anderson to join the conspiracy to eliminate Source as a wholesaler by pointing out that Anderson could profit by taking over Source's business and obtaining its profits through price increases imposed on the retailers. Thus, Castardi of Curtis told Mr. Anderson that "you need to let Source go out first." In certain areas--Arizona, for example--Anderson and Source were the only wholesalers. Once Source was excluded from the market and its business destroyed, Castardi told Mr. Anderson, in words or substance, that Anderson could use its regional market power to "get all your [Anderson's] profits from the retailers." And in a phone call with Frank Stockard, President of Anderson, Duloc of Kable discussed the idea of offering Anderson exclusivity in certain territories in exchange for Anderson retracting the proposed surcharge. According to Duloc, Anderson could obtain the profits it desired by using its exclusivity arrangement to increase the prices to retailers. Anderson refused to participate in this blatantly unlawful market allocation. Kable responded by reaffirming its participation in defendants' boycott of Anderson, thereby refusing to supply Anderson with the magazines it distributes, including those published by defendant Bauer.

(PAC ¶¶ 56-58 (emphases added).) According to the Complaint, "Duloc from Kable" proceeded to solicit Sullivan, "the president and CEO of . . . Comag to join defendants' conspiracy" to end shipments to Anderson and Source. (PAC ¶ 59.) Comag, however, refused (see id.), and subsequent

[e]-mail exchanges and transmissions among defendants Rodale, DSI, AMI and Bauer, show that defendants perceived Comag's actions as a potential threat to the cohesion and unity of their conspiracy and to defendants' goal for 100% participation by the publishers and national distributors in the boycott of Anderson and Source. On January 29, 2009, Richard Alleger, a vice president at Rodale, sent an e-mail to Michael Porche ("Porche"), the president and CEO of DSI, stating that he had just read an e-mail from Comag to its clients: "they have reached an understanding with BOTH Anco [i.e., Anderson] and Source and will continue to SHIP! Sullivan [the CEO of Comag] is dangerous." Porche forwarded the message to the president of AMI--Rodale's competitor--who in turn forwarded it to Michael Roscoe, a consultant and former DSI employee, who was one of the conduits through which the conspiracy was effectuated.

61. Two days later, on Saturday, January 31, Rodale complained again, this time to Bauer, another of its co-conspirators and competitors, that Comag had agreed to continue to supply Source. Confirming the intent, and obviously anticipating the success, of the conspiracy, Bauer reassured Rodale, stating: "Doesn't matter [S]ource won't be around much longer."

(PAC ¶¶ 60-61 (emphases added).)

20

In the meantime, according to the proposed amended complaint,

> [o]n or about January 25, 2009, the presidents of competitors TWR and Kable scheduled a breakfast meeting for Thursday, January 29, 2009 to discuss the conspiracy.

> 63. Hudson was at the heart of the conspiratorial meetings. After business hours on or about January 29, 2009, key employees of certain defendants--ostensible competitors--including Dennis Porti of Curtis and Michael Cvrlje of TWR, met at Hudson's offices in North Bergen, New Jersey. David Parry of News Group--a competitor of Hudson--and John Rafferty of DSI, also were present at that January 29 meeting at Hudson's offices. At this and the other meetings among the defendants, they discussed and planned their collusive activity, including their market allocation agreement with respect to the Anderson and Source business and customers.

(PAC ¶¶ 62-63 (as amended by letter from Anderson's counsel to the district court dated October 4, 2010 ("Amending Letter"), at 1 (emphases added)).) Thus, in late January,

> Curtis, on behalf of publishers Hachette, Rodale and AMI, and Kable, on behalf of publisher Bauer, acting in concert with the other defendants and pursuant to and in furtherance of defendants' conspiracy to eliminate Anderson as a wholesaler, . . . cut Anderson off from its supply of their magazines. . . . [O]n the morning of January 29, 2009, Curtis sent an e-mail to its publisher clients, informing them that, "effective immediately, Curtis is suspending all further shipments of magazines to all Anco [i.e., Anderson] wholesaler operations." Curtis clients AMI and Hachette cut off Anderson soon afterward . . . .

(PAC ¶ 66 as amended by Amending Letter at 2 (emphases added).) Anderson alleged that the only

magazines it received from AMI and Hachette thereafter were "a limited number of magazines . . .

that were already 'in the pipeline' from the magazine printers and could not be diverted." Id.

On Monday February 2, two business days later, TWR and Time cut off the supply of

Time's magazines to Anderson. (See PAC ¶ 67.) Although on January 31, TWR's CEO Jacobsen had

led Anderson to believe that TWR agreed to a continuing relationship, with financial accommodations

that obviated Anderson's proposed Surcharge, TWR and Time instead joined, or had joined, the

agreement to boycott Anderson:

[Anderson] was led by Jacobsen to believe that TWR and Anderson had an agreement that would obviate the need for a surcharge, an agreement for an increase of 2.00% in the discount to Anderson of the magazines' cover prices for all Time weeklies, and 2.75% for all People weeklies. Anderson also was led to believe by Jacobsen that TWR also agreed to discuss scan-based trading on Monday, February 2, 2009, in return for which, after the scan-based trading call, Anderson would make a $13 million payment to TWR for amounts supposedly due. Anderson rescinded its fee proposal as a result of this compromise settlement.

. . . .

67. On February 2, Time and TWR--acting in concert with the other defendants, and pursuant to and in furtherance of defendants' conspiracy to eliminate Anderson as a wholesaler--reneged on its agreement to continue to supply Time's magazines to Anderson. Jacobsen informed Anderson that TWR and Time executives had decided "to change the channel," that "they were going to have to use two wholesalers," and that "that was the way it was going to be."

. . . .

70. Statements made by the defendants to Anderson also make clear that the defendants, as a result of their inter-competitor meetings and communications, had agreed to a coordinated boycott of Anderson and Source. On or about January 21, 2009, after talking with representatives of TWR and Kable, Mr. Anderson spoke with Castardi, the president and CEO of defendant Curtis. Castardi, acting on behalf of Curtis as well as all the publishers represented by Curtis--including publisher defendants AMI, Hachette, and Rodale--told Mr. Anderson, in words or substance, that "I [Castardi] don't want a problem. I would like to get this worked out. But I'm going to have to go with whatever Rich [Jacobsen, CEO of defendant TWR] does." When Mr. Anderson later told Jacobsen on January 31, 2009 what Castardi had told him-- that "[Castardi's] going whatever way you [Jacobsen] go"--Jacobsen did not deny it, but instead crossed his arms, nodded in agreement and smiled.

71. At the January 31 meeting with Jacobsen, Jacobsen told Mr. Anderson that he "ha[d] Greg Mays [the CEO of Source] flying in at 1:00 pm to meet with me. And I'm going to deliver the message that, as long as I'm at TWR or Ann Moore is at Time, we will never, ever do business with Source again." Indeed, TWR's competitor, Curtis, was already aware of this information--the same day, a Source executive was advised by Castardi, the president of Curtis that, on January 31, he (Castardi) knew, with "100% certainty," that TWR, Bauer and AMI would refuse to supply product to Source--even though, by this time, Source had publicly rescinded its surcharge proposal.

(PAC ¶¶ 65, 67, 70-71 (emphases added).)

22

In an order dated October 25, 2010, also reported at 732 F.Supp.2d 389, the district court denied Anderson's motions for reconsideration and for leave to file the proposed amended complaint, see id. at 406-07. In denying reconsideration, the court noted principally that Anderson did not point to anything the court had overlooked but merely reargued contentions already addressed by the court.

> In its Opinion, the Court found that the alleged antitrust conspiracy was not plausible because "publishers and national distributors have an economic self-interest in more wholesalers, not fewer; more wholesalers yields greater competition, which is good for suppliers," (Op.8.) Specifically, the Court held that "it is implausible that magazine publishers would conspire to deny retailers access to their own products," (Id.), and noted that, in the Complaint, Anderson itself pointed out that its elimination as a wholesaler has substantially reduc[ed] the output of magazines . . . and the ability of retailers to obtain those magazines. . . . Because "determining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense," Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009), the Court's conclusion was neither impermissible, nor "clear error."

> Anderson also argues that the Court's determination that the 7-cent surcharge was a "non-negotiable take-it-or-leave-it" demand was "mistaken" and "overlooks the fact, recognized in another part of the Court's Opinion, that neither Anderson nor Defendants treated it as such and that Anderson was entirely flexible and willing to compromise . . . ." (Pl. Mem. 4.) This argument is unavailing. Anderson impliedly admits that the Court did not "overlook" this information because, as Anderson points out, the Court recognized in another part of its Opinion that the Defendants had varied reactions to the surcharge. Additionally, the fact that the Defendants had several different reactions to the surcharge--whether the surcharge was negotiable or not--clearly suggests the absence of an antitrust conspiracy. Plaintiffs impliedly ask the Court to assume that either (1) the wholesalers first had several different reactions to the announced surcharge and then abruptly changed course, deciding to engage in unlawful collective action; or (2) the original non-parallel conduct was nothing more than a ruse. The most plausible scenario, however, is that the Defendants each separately came to a similar conclusion--that they did not want to pay a 7-cent surcharge. Thus, the Court permissibly determined that the Defendants' rejection of the surcharge was not plausibly the product of collective action and was simply "a common response to a common stimulus."

732 F.Supp.2d at 406-07 (other internal quotation marks omitted) (emphases added).

The district court denied Anderson's motion for permission to file its proposed amended complaint, attached to the motion for reconsideration, stating only as follows:

> As to Plaintiffs' request for leave to amend its Complaint, there is no basis for it. The addition of numerous conclusory allegations does not cure the deficiencies of the Complaint the Court dismissed on August 2, 2010[.]

Id. at 407.

## II. DISCUSSION

On appeal, Anderson contends principally that the fact-specific allegations of its Complaint and of the proposed amended complaint--which the district court refused to allow Anderson to file, ruling that it was conclusory and did not cure the deficiencies that the court found in the Complaint--sufficed to support a plausible claim of conspiracy and thereby to state a claim under § 1 of the Sherman Act. Whether or not the district court correctly viewed the allegations of the Complaint itself as too conclusory, we conclude that the court erred in ruling that the additional factual allegations in the PAC were equally conclusory and provided no plausible basis for an inference of conspiracy. In light of the PAC's allegations, we have difficulty with the court's antitrust analysis and its application of Twombly's plausibility test.

### A. The Sherman Act, Plausibility, and Standards of Review

Rule 8 of the Federal Rules of Civil Procedure provides that a complaint seeking relief "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This Rule does not countenance pleadings that are conclusory; it requires factual allegations that are sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (internal quotation marks omitted). Conclusory allegations of "participation" in a "conspiracy" have long been held insufficient

24

to state a claim. See, e.g., X-Men Security, Inc. v. Pataki, 196 F.3d 56, 71 (2d Cir. 1999); Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999); Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977). "Rule 8(a) 'contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented' and does not authorize a pleader's 'bare averment that he wants relief and is entitled to it.'" Twombly, 550 U.S. at 555 n.3 (quoting 5 C. Wright & A. Miller, Federal Practice & Procedure § 1202, at 94, 95 (3d ed. 2004)).

For a complaint to be sufficient, the claim asserted must be one that, in light of the factual allegations, is at least "plausible." E.g., Twombly, 550 U.S. at 570. To present a plausible claim, the "pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Id. at 555 (internal quotation marks omitted) (emphasis ours). It must allege facts that would be sufficient to permit a reasonable inference that the defendant has engaged in culpable conduct: "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949.

The Sherman Act prohibits, inter alia, "[e]very contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

> Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy," Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 775 (1984), "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express" . . . .

Twombly, 550 U.S. at 553 (quoting Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 540 (1954) (emphasis ours)).

Agreements within the scope of § 1 may be either "horizontal," i.e., "agreement[s] between competitors at the same level of the market structure," or "vertical," i.e., "combinations of

25

persons at different levels of the market structure, e. g., manufacturers and distributors." United States v. Topco Associates, Inc., 405 U.S. 596, 608 (1972). As to horizontal agreements, "[o]ne of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." Id.; see id. at 609 n.9 ("remov[ing any] doubt" that "horizontal territorial limitations, unaccompanied by price fixing, are per se violations of the Sherman Act"). Vertical restraints that do not involve price-fixing are generally judged under the "rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition." Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 (1984); see, e.g., Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977). The Supreme "Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 290 (1985); see, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959).

In Klor's, the plaintiff retailer ("Klor's"), which competed against a national retail chain ("Broadway-Hale"), alleged a conspiracy that was both vertical and horizontal. It alleged, inter alia, that 10 national manufacturers of household appliances "conspired among themselves and with Broadway-Hale . . . not to sell to Klor's." Id. at 209. The Supreme Court noted that "some agreements['] . . . validity depend[s] on the surrounding circumstances," while other "classes of restraints . . . from their 'nature or character' [a]re unduly restrictive, and hence forbidden by both the common law and the statute," id. at 211 (quoting Standard Oil of New Jersey v. United States, 221 U.S. 1, 58, 65 (1911)). Reversing the grant of summary judgment against Klor's, the Court found that "Klor's allegations clearly show one type of trade restraint and public harm the Sherman Act forbids," Klor's, 359 U.S. at 210. "Group boycotts, or concerted refusals by traders to deal with other traders, have long been held to be in the forbidden category." Id. at 212.

26

In order to establish a conspiracy in violation of § 1, whether horizontal, vertical, or both, proof of joint or concerted action is required; proof of unilateral action does not suffice. See, e.g., Monsanto, 465 U.S. at 761 ("there is [a] basic distinction between concerted and independent action--a distinction not always clearly drawn by parties and courts"). "Circumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" Id. at 764 (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)). "Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." Monsanto, 465 U.S. at 761 (emphasis added).

Although the district court in the present case, as noted in Part I.D. above, faulted Anderson's Complaint for "not contain[ing] allegations of direct evidence of a conspiracy," 732 F.Supp.2d at 397 (emphasis added), conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through "inferences that may fairly be drawn from the behavior of the alleged conspirators," Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1043 (2d Cir. 1976); see, e.g., United States v. Snow, 462 F.3d 55, 68 (2d Cir. 2006) ("conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with . . . precision") (internal quotation marks omitted), cert. denied, 549 U.S. 1150 (2007). In order to prove a conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 764 (internal quotation marks omitted) (emphasis added).

At the pleading stage, a complaint claiming conspiracy, to be plausible, must plead "enough factual matter (taken as true) to suggest that an agreement was made," i.e., it must provide

27

"some factual context suggesting [that the parties reached an] agreement," not facts that would be "merely consistent" with an agreement. Twombly, 550 U.S. at 556, 549, 557. A complaint alleging merely parallel conduct is not sustainable:

> A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim[, some] further circumstance pointing toward a meeting of the minds . . . . An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of "entitle[ment] to relief. . . . [T]erms like "conspiracy," or even "agreement," are border-line: they might well be sufficient in conjunction with a more specific allegation--for example, identifying a written agreement or even a basis for inferring a tacit agreement . . . .

Id. at 557 (other internal quotation marks omitted) (emphases added).

However, to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action, as would be required at later litigation stages such as a defense motion for summary judgment, see, e.g., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 597-98 (1986), or a trial, see, e.g., Monsanto, 465 U.S. at 768; Theatre Enterprises, 346 U.S. at 540-41.

> Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

Twombly, 550 U.S. at 556 (emphases added).

Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. See generally Anderson v. Bessemer City, 470 U.S. 564, 575 (1985) ("two or more witnesses" may tell mutually inconsistent but "coherent and facially plausible stor[ies]"). The choice between or among plausible inferences or

28

scenarios is one for the factfinder, see id.; Monsanto, 465 U.S. at 766 & n.11 (the meaning of documents that are "subject to" divergent "reasonable . . . interpret[ations]" either as "referring to an agreement or understanding that distributors and retailers would maintain prices" or instead as referring to unilateral and independent actions, is "properly . . . left to the jury"); id. at 767 n.12 ("The choice between two reasonable interpretations of . . . testimony properly [i]s left for the jury.").

The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion. "[F]act-specific question[s] cannot be resolved on the pleadings." Todd v. Exxon Corp., 275 F.3d 191, 203 (2d Cir. 2001) ("Todd"). A court ruling on such a motion may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible.

Rather, in determining whether a complaint states a claim that is plausible, the court is required to proceed "on the assumption that all the [factual] allegations in the complaint are true." Twombly, 550 U.S. at 555 (emphasis added). Even if their truth seems doubtful, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," id. at 556 (internal quotation marks omitted). Given that the plausibility requirement "does not impose a probability requirement at the pleading stage," the Twombly Court noted that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." Id. (internal quotation marks omitted) (emphases added).

Whether a complaint alleges sufficient facts to state a claim on which relief can be granted is a question of law, see, e.g., De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996), which we consider de novo, see, e.g., Starr v. Sony BMG Music Entertainment, 592 F.3d 314, 321 (2d Cir. 2010) ("Starr"), cert. denied, 131 S. Ct. 901 (2011); Arar v. Ashcroft, 585 F.3d 559, 567

(2d Cir. 2009) (en banc) ("Arar"), cert. denied, 130 S. Ct. 3409 (2010); Todd, 275 F.3d at 197. In reviewing the complaint, we "giv[e] no effect to" assertions of law or to "legal conclusions couched as factual allegations," Starr, 592 F.3d at 321; but "we accept as true the factual allegations of the complaint, and construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff," Arar, 585 F.3d at 567; see, e.g., Papelino v. Albany College of Pharmacy of Union University, 633 F.3d at 85 n.1; Pension Committee of University of Montreal Pension Plan v. Banc of America Securities LLC, 568 F.3d 374, 381 (2d Cir. 2009); Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).

When a party requests leave to amend its complaint, permission generally should be freely granted. See, e.g., Foman v. Davis, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a)(2). We review the district court's denial of a request for leave to amend for abuse of discretion. See, e.g., Foman, 371 U.S. at 182; Starr, 592 F.3d at 321. An abuse of discretion may consist of an erroneous view of the law, a clearly erroneous assessment of the facts, or a decision that cannot be located within the range of permissible decisions. See, e.g., Sims v. Blot, 534 F.3d 117, 132 (2d Cir. 2008). Leave to amend may properly be denied if the amendment would be futile, see, e.g., Foman, 371 U.S. at 182, as when the proposed new pleading fails to state a claim on which relief can be granted, see, e.g., Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir. 1991). The adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading. See, e.g., id. Hence, a denial of leave to amend on the ground that the proposed new complaint does not state a claim on which relief can be granted is a decision based on a legal ruling and is one that we also review de novo. See, e.g., Starr, 592 F.3d at 321.

B.  Differences Between the Twombly Complaint and Anderson's PAC

With respect to the application in the present case of the plausibility principles set out in Twombly, it is important to bear in mind the nature of the complaint with which the Supreme Court was concerned in Twombly.  The Court noted that the question before it was "whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action." 550 U.S. at 548-49 (emphasis added).  The Court pointed out that

> [w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

Id. at 556-57 (emphases added).

The complaint at issue in Twombly provided no such context.  The claim was that entrenched local telephone companies (the "incumbent local exchange carriers" or "ILECs") violated § 1 by preventing the entry of new carriers into their respective territories.  The complaint did not, however, plausibly allege an agreement between or among ILECs; rather, the "plaintiffs . . . proceed[ed] exclusively via allegations of parallel conduct," Twombly, 550 U.S. at 565 n.11 (emphasis added).  They alleged that the ILECs "conspired to restrain trade in two ways":  first by "engag[ing] in parallel conduct in their respective service areas to inhibit the growth of upstart" competitors, id. at 550 (internal quotation marks omitted); and second by "agree[ing] . . . to refrain from competing against one another," with such an agreement, "'upon information and belief,'" simply "to be inferred from the ILECs' common failure meaningfully [to] pursu[e]" what the plaintiffs characterized as "attractive business opportunit[ies] in contiguous markets where they possessed

31

substantial competitive advantages," id. at 551 (other internal quotation marks omitted) (emphases added). Thus, the thrust of the Twombly complaint was that "some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years," id. at 560 n.6 (emphases added), as the complaint merely "identif[ied] a 7-year span in which the § 1 violations were supposed to have occurred" and "mentioned no specific time, place, or person involved in the alleged conspiracies," id. at 565 n.10 (emphasis added). "[N]othing in the [Twombly] complaint intimate[d] that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance," id. at 566; the "complaint le[ft] no doubt that plaintiffs rest[ed] their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," id. at 564 (emphasis added).

Anderson's proposed amended complaint in the present case is vastly different from the complaint at issue in Twombly. Although the district court stated that "Anderson claims an economically implausible antitrust conspiracy based on sparse parallel conduct allegations," 732 F.Supp.2d at 402, that "Anderson does not place its antitrust conspiracy in a context suggesting a preceding agreement," id., and that the PAC merely "add[ed] numerous conclusory allegations" that did nothing to cure those perceived defects, id. at 407, the court's criticisms did not accurately characterize the PAC. The PAC alleges actual agreement; it alleges not just that all of the defendants ceased, in virtual lock-step, to deal with Anderson, but alleges that on various dates within the preceding two-week period defendants and News Group--through their executives, 10 of whose names or positions are specified--had met or communicated with their competitors and others and made statements that may plausibly be interpreted as evincing their agreement to attempt to eliminate Anderson and Source as wholesalers in the single-copy magazine market and to divide that market

between News Group and Hudson. The PAC alleges that defendants' meetings and communications began four days after Anderson's January 14 telephone interview with The New Single Copy magazine and included the following:

■ on Sunday January 18, **Castardi**, Curtis's president, met with **Duloc**, Kable's president and CEO (see PAC ¶ 56);

■ Curtis and Kable, competitors whose publisher clients included AMI, Rodale, Hachette, and Bauer, thereafter refused to enter into any legitimate substantive negotiations with Anderson with respect to the Surcharge (see PAC ¶ 66);

■ on January 22, Kable communicated with its competitor TWR (see PAC ¶ 57), and on Sunday January 25, **Duloc**, the president of Kable, and **Jacobsen**, the president of TWR, scheduled a breakfast meeting for January 29 (see PAC ¶¶ 56, 62);

■ on or about January 29, after business hours, Hudson hosted a meeting at its offices in North Bergen, New Jersey, attended by its competitor News Group (represented by David **Parry**) and by key employees of three of the distributor defendants: Dennis **Porti** of Curtis, John **Rafferty** of DSI, Michael **Cvrlje** of TWR (see PAC ¶ 63 (as amended by Amending Letter at 1));

■ on Thursday January 29, Curtis sent an e-mail to its publisher clients stating that it was immediately ceasing shipments to Anderson; Curtis clients AMI and Hachette cut off Anderson soon afterward (see PAC ¶ 66); Kable, on behalf of Bauer, also cut Anderson off from its supply of Bauer's magazines (see PAC ¶¶ 58, 66);

■ on Monday February 2, TWR, despite Jacobsen's having led Anderson to believe on January 31 that Time would continue to ship magazines to Anderson, cut Anderson off (see PAC ¶¶ 65, 67-69).

In the above-cited paragraphs, the PAC alleged that in those meetings and communications the defendants planned a concerted boycott of Anderson, or Source, or both. Lending support to an inference of such planning, the PAC includes other allegations of communications between defendants and of statements by certain of the defendants to Anderson and Source:

■ **Castardi** of Curtis and **Duloc** of Kable suggested to Anderson that Source should be eliminated as a wholesaler and that Anderson could then obviate the need for its

Surcharge by simply becoming the publishers' exclusive wholesaler in areas formerly serviced by both Anderson and Source and imposing increased prices on retailers; however, **Castardi** told Anderson's CEO "'you need to let Source go out first'" (PAC ¶ 58);

■ when Anderson declined the invitation to join the group planning to eliminate Source, Kable refused to continue to supply Anderson with magazines published by Kable's clients, including Bauer (see PAC ¶ 58);

■ when Anderson attempted to negotiate with Curtis, **Castardi** said he, on behalf of AMI, Hachette, and Rodale, would do whatever TWR did; when Anderson's CEO met with TWR's CEO Jacobsen on January 31 and reported Castardi's statement, **Jacobsen** just nodded, smiled, and crossed his arms (see PAC ¶ 70).

The PAC also alleged that

■ in late January, Kable's president **Duloc** contacted Comag's president and CEO Sullivan and urged him to have Comag stop shipping to Anderson and/or Source (see PAC ¶ 59);

■ on January 29, Rodale's vice president Richard **Alleger** sent an e-mail to Michael **Porche**, DSI's president and CEO, stating that Comag "'will continue to SHIP!'" to "'BOTH Anco [i.e., Anderson] and Source,'" and that "'Sullivan . . . is dangerous'" (PAC ¶ 60);

■ DSI's **Porche** forwarded Rodale's concerned e-mail to the president of AMI (David **Pecker**), a Rodale competitor (see PAC ¶¶ 51, 60);

■ on January 31, Rodale complained to its competitor Bauer about Comag's agreement to continue supplying Source, and Bauer responded that it "'[d]oesn't matter[; S]ource won't be around much longer'" (PAC ¶ 61 (emphasis ours));

■ on January 31, TWR's **Jacobsen** told Anderson that he was about to inform Source that "'as long as I'm at TWR or **Ann Moore** is at Time, we will never, ever do business with Source again'" (PAC ¶ 71);

■ earlier on January 31, Curtis's **Castardi** had told a Source executive that Castardi "knew, with '100% certainty,' that TWR, Bauer, and AMI would refuse to supply product to Source" (PAC ¶ 71 (emphases ours)).

In sum, taking the PAC's allegations as to the chronology as true, the presidents of Curtis and Kable met on January 18; Kable and Curtis thereafter refused even to enter into legitimate negotiations with Anderson; Kable contacted TWR on January 22; on January 25, the presidents of

34

Kable and TWR scheduled a breakfast meeting for January 29; on or about January 29, at the offices of Hudson, there was an after-hours meeting whose participants included specified key employees of Curtis, DSI, and TWR--as well as News Group, which was to share the wholesale market with Hudson after Anderson and Source were eliminated. On January 31 Bauer told Rodale that Source "won't be around much longer," which--considering the failure of Curtis, the largest distributor, in its 2008 attempt to terminate Anderson unilaterally--was a reassurance that Bauer could not have given on the basis of any one entity's independent conduct. And on January 31, even before Source was informed by TWR itself that TWR and Time would stop doing business with Source, Curtis's president Castardi--although Curtis did not represent Time and was TWR's competitor--had said he "knew, 'with 100% certainty'" that Source would be cut off by TWR, which represented Time. At the same time, Castardi said he knew with 100% certainty that Bauer--which was represented by DSI and Kable but not by Curtis--would cease to supply Source.

Thus, within days of Anderson's announcement of its proposed Surcharge, each of the four distributor defendants met or communicated with at least two other distributor defendants; both TWR and Curtis met or spoke with all three other distributor defendants; and Kable spoke with at least two other distributor defendants, as well as with Comag, which Kable attempted-- unsuccessfully--to have join the planned boycott of Source and Anderson. Each of the publisher defendants used at least one of the four distributor defendants to manage that publisher's relationships with wholesalers. AMI, Hachette, and Rodale all used both Curtis and DSI as distributors; Bauer used both DSI and Kable as distributors. Rodale and Bauer communicated directly with each other, and Rodale communicated with AMI through DSI. The only two distributors not alleged in the PAC to have communicated directly with each other are DSI and Kable; but at least indirect communication between the two is inferable, given that both of them represented Bauer, and that Bauer on January

35

31 expressly reassured Rodale that Source would soon be eliminated. The PAC does not include allegations that Time or Hachette met or communicated with other publisher defendants; but it does allege that when the distributors they used said Anderson would be cut off, Time and Hachette promptly cut Anderson off.

We note that the PAC indicates that DSI is a subsidiary of AMI and that TWR is a subsidiary of Time; and it is well established that a corporation and its wholly-owned subsidiary are not considered separate entities for purposes of § 1 of the Sherman Act, see American Needle, Inc. v. National Football League, 130 S. Ct. 2201, 2211-12 (2010); Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771 (1984). However, the facts alleged in the PAC are sufficient to suggest that the cessation of shipments to Anderson resulted not from isolated parent-subsidiary agreements but rather from a lattice-work of horizontal and vertical agreements to boycott Anderson.

In sum, given the above factual allegations and the reasonable inferences that may be drawn from them, the PAC is sufficient to make Anderson's antitrust claim plausible. The district court's ruling that the PAC contained only conclusory assertions was error, and the court's failure to assume the truth of reasonable inferences that could be drawn from Anderson's allegations, see 732 F.Supp.2d at 402 ("on a motion to dismiss, . . . factual inferences are not entitled to" be "take[n] . . . as true"), was likewise error.

C.  Analytical Problems

In addition to our conclusion that the district court erred in characterizing the PAC's factual allegations as conclusory and in refusing to accept as true the reasonable inferences that could be drawn from those allegations, we have difficulties with some of the court's analytical constructs, including its application of Twombly's plausibility test.

36

### 1. The Proper Application of the Plausibility Requirement

When the district court ruled that Anderson did not state a plausible § 1 claim because "[u]nilateral parallel conduct [by the defendants wa]s completely plausible," 732 F.Supp.2d at 399 (emphases added); see also id. at 400, 407, the plausibility inquiry was misdirected. The question at the pleading stage is not whether there is a plausible alternative to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible. As discussed in Part II.A. above, the plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible. The view of the district court here that "it is plausible that each of the publisher Defendants unilaterally stopped shipping magazines to Anderson rather than pay the Surcharge," 732 F.Supp.2d at 400 (emphases added), was thus not a proper basis for finding that Anderson had not pleaded a claim that was plausible.

The court also found that the possibility that each of the defendants had acted "separately" in deciding to stop supplying magazines to Anderson was "[t]he most plausible scenario," id. at 407 (emphasis added). But on a Rule 12(b)(6) motion it is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives. Assuming that Anderson can adduce sufficient evidence to support its factual allegations, the choice between or among plausible interpretations of the evidence will be a task for the factfinder.

## 2. Factual Findings

We note also that in finding Anderson's view of the events implausible, or less plausible than the possibility that defendants acted unilaterally, the court essentially made a number of other factual findings. For example, the court found that the statements attributed to Curtis's CEO, Robert Castardi, were "not inculpatory." 732 F.Supp.2d at 402. The court found that Castardi's statement to Anderson--that once Source was eliminated Anderson could increase its earnings by having an exclusive territory in which it could raise prices to retailers, but "'you need to let Source go out first'"--was "not . . . an invitation to join a massive antitrust conspiracy" to eliminate Source. Id. Perhaps it was not; but whether it was or not is a question for a factfinder. As set out in Part II.B. above, there are allegations of statements by, among others, Kable's Duloc, Rodale's Alleger, and TWR's Jacobsen, indicating that defendants wished to eliminate Source, as well as Bauer's assurance to Rodale that Source would soon be gone. With the PAC read "as a whole," rather than piecemeal, e.g., Yoder v. Orthomolecular Nutrition Institute, Inc., 751 F.2d 555, 562 (2d Cir. 1985), the existence of a conspiracy to eliminate Source could permissibly be inferred; and any ambiguity as to whether the statements to Anderson by Castardi and Duloc constituted invitations to join such a conspiracy would remain to be resolved by a factfinder. In any event, the district court could not properly make an interpretive finding on a Rule 12(b)(6) motion, in effect ruling as a matter of law that that Castardi statement was not an invitation to join such a group effort to eliminate Source.

The court also found that Castardi's statement that he was "'going to have to go with whatever Rich [Jacobsen, CEO of TWR] does' . . . suggests only that he would wait to see what TWR did and that, in fact, he had no actual knowledge of Jacobsen's plans regarding Anderson." 732 F.Supp.2d at 402 (emphasis added); see also id. at 398-99 (finding that defendants' decisions to stop supplying Anderson were "unchoreographed"). Castardi might, of course, claim that the court's

38

interpretation of his statement was what he meant; but in fact stating that he would "go with whatever [Jacobsen] does" is not precisely the same as stating that he would "wait to see" what Jacobson would do. And indeed, taking the factual allegations of the Complaint and the PAC as true, Castardi in fact did not wait to see what TWR actually did, for Castardi had Curtis and its publisher clients cut Anderson off on January 29. TWR did not cut Anderson off until February 2.

Castardi's statement that Curtis would do what TWR would do, along with Curtis's termination of Anderson in advance of such a termination by TWR, must further be considered in light of two other allegations: (1) that Curtis had been unsuccessful in 2008 when it tried to terminate Anderson unilaterally, and (2) that before Source was terminated by TWR, AMI, and Bauer, Castardi told a Source executive that Castardi "knew, 'with 100% certainty,'" that those entities were going to refuse to supply Source. In these circumstances it is plausible to infer that Castardi knew in advance, with certainty, that TWR would cease to supply Anderson; and from that certain foreknowledge, an inference of advance agreement is plausible.

### 3. Other Bases for the Court's Finding of Implausibility

#### a. Varied Responses to the Surcharge

We also have difficulties with the district court's view that Anderson's conspiracy claim was implausible because defendants had "a variety of reactions" to Anderson's announcement of its Surcharge, 732 F.Supp.2d at 394, with some publishers or distributors initially entering into negotiations for alternatives to the Surcharge--and suggesting alternatives that varied--and other publishers and distributors not negotiating. The court stated that "[c]onspirators hatching a concerted scheme to destroy Anderson would not have reacted so differently to the Surcharge," id. at 397. However, there is nothing implausible about coconspirators' starting out in disagreement as to how

39

to deal conspiratorially with their common problem. As the court itself noted, "the <u>key</u> parallel conduct allegation" was that all of the publisher and distributor defendants ceased doing business with Anderson, <u>id</u>. at 398 (emphasis added). The court's reliance on the variety of defendants' original reactions failed to take into account that, notwithstanding their responses initially, some two weeks later every defendant publisher and distributor acted, within a span of three business days, to cut Anderson off.

### b. <u>Collateral Estoppel</u>

In analyzing Anderson's claims against each defendant, the district court found that AMI could not have been a member of the alleged conspiracy to boycott Anderson. Citing a February 2009 Delaware Chancery Court order, and invoking the principle of collateral estoppel, the district court found that AMI had not cut Anderson off but instead had "continued to ship magazines to Anderson in February 2009, after the alleged boycott occurred," 732 F.Supp.2d at 403. However, given that, in order to determine the preclusive effect of a state-court decision, a federal court must look to the law of that state and should not give the state-court decision any greater preclusive effect than the courts of that state would give it, <u>see</u>, <u>e.g.</u>, <u>Marrese v. American Academy of Orthopaedic Surgeons</u>, 470 U.S. 373, 380 (1985), we have two difficulties with the district court's collateral estoppel ruling.

First, the Delaware Chancery decision relied on by the district court merely granted a "Temporary Restraining Order," <u>American Media, Inc. v. Anderson News, LLC</u>, C.A. No. 4369-VCL (Del. Ch. Feb. 13, 2009). Under Delaware law, collateral estoppel, or issue preclusion, is not available unless, <u>inter alia</u>, a question of fact essential to the judgment is litigated and determined in "a valid and final judgment." <u>Messick v. Star Enterprise</u>, 655 A.2d 1209, 1211 (Del.

40

1995) (internal quotation marks omitted); see, e.g., The Thomas and Agnes Carvel Foundation v. Carvel, No. 3185-VCP, 2008 WL 4482703, at *5 (Del. Ch. Sept. 30, 2008) (denying collateral estoppel effect to a New York court's findings in granting a preliminary injunction, because that "is not a final judgment of the court on the merits"). The Delaware Chancery Temporary Restraining Order relied on by the district court was not a final judgment.

Second, although the Delaware Chancery Temporary Restraining Order required Anderson to return to AMI--and to Hachette, which was also a plaintiff in that action--all of those plaintiffs' magazines that were then in Anderson's possession, the order made no findings whatever as to when Anderson had received those magazines or when their shipment had been initiated. The Complaint alleged that AMI and Hachette had cut Anderson off "in late January." (Complaint ¶ 47; see also PAC ¶ 66 (alleging that the magazines that were the subject of the state-court order had been "'in the pipeline' from the magazine printers" before Anderson was cut off "and could not be diverted").) The state court's order made no contrary finding and thus provided no basis for a deviation from the principle that on a Rule 12(b)(6) motion, the district court was required to accept Anderson's allegations as true.

### c. The Common Stimulus

The district court also ruled that Anderson's presentation of a "common economic stimulus, impelling an immediate market reaction," 732 F.Supp.2d at 401, made it impossible for Anderson to plead a viable § 1 claim. It stated that "Anderson alleges facts suggesting that the Defendants merely responded to a common market stimulus created by Anderson itself," id. at 402, and that "[h]aving proposed its pay-it-or else Surcharge, Anderson can not claim collusion in the Defendants' refusal to acquiesce to its self-destructive demand," id. at 401 (emphasis added). We have two difficulties with this reasoning. First, the court itself noted (see Part II.C.3.a. above) that several of the defendants had initially entered into negotiations with Anderson for various alternatives

41

to the Surcharge, and that some had reached agreement on such alternatives, see 732 F.Supp.2d at 397. The facts that there were various proposed alternatives to the Surcharge--and that Anderson agreed to some of them--undercut both the court's own view of the Surcharge as a take-it-or-leave-it demand by Anderson and the court's suggestion that the defendants also so viewed it.

Second, the mere fact that an offer of goods or services at a given price may be nonnegotiable does not mean that the offerees, in responding to it, cannot violate the antitrust laws. Thus, the Twombly Court referred not simply to "responses" to given stimuli, but rather to "independent responses to common stimuli, or . . . interdependence unaided by an advance understanding among the parties." Twombly, 550 U.S. at 556 n.4 (internal quotation marks omitted) (emphases added). The presentation of a common economic offer may well lend itself to innocuous, independent, parallel responses; but it does not provide antitrust immunity to respondents who get together and agree that they will boycott the offeror. The latter is what the PAC alleged.

### d.  The Role of Hudson

The district court found that, in light of Anderson's withdrawal of its assertion that Hudson took over Anderson's retail distribution business, there was "no conceivable role for Hudson in the alleged conspiracy," 732 F.Supp.2d at 403, 405, because Hudson, a wholesaler rather than an entity higher in the distribution chain, "could not cut off Anderson's magazine supply," id. at 403. We have several difficulties with this analysis.

First, as discussed in Part II.A. above, § 1 applies not just to horizontal conspiracies between or among competitors but also to vertical contracts and to boycotts agreed to by a group of suppliers and their favored customer or customers. Second, the gist of conspiracy is agreement. Thus, if Hudson--assuring, along with News Group, a continuation of wholesaler services--agreed with the publisher and distributor defendants to attempt to eliminate Anderson and Source as wholesalers,

42

Hudson may be liable under § 1, even if it did not take over any of the business lost by Anderson. Third, although the court emphasized that Hudson could not engage in conduct that would "parallel" the conduct of the publishers or the distributors, it is entirely plausible that Hudson had an interest in participating in an endeavor to eliminate Anderson and Source--Hudson's largest competitors--as wholesalers, hoping to gain market share. Indeed, the alleged goal of the conspiracy was to eliminate Anderson and Source in order to divide the wholesale market between News Group and Hudson and give News Group and Hudson exclusive territories--thereby affording retailers no choice as to wholesale supplier (see Part II.C.3.e. below).

Fourth, the court's analysis, focusing solely on the concept of parallelism, disregarded Anderson's factual allegations. They include the allegation that on or about January 29, 2009, key employees of Curtis, DSI, and TWR, and of Hudson's competitor News Group (all identified by name in the PAC), met at Hudson's offices in North Bergen, New Jersey. Although the PAC did not identify the person or persons attending that meeting on behalf of Hudson, it is surely inferable that Hudson was represented, as the meeting was at its offices. Further, the fact that the meeting was held after normal business hours lends itself to a plausible inference that the meeting--of two levels of competitors (three distributors and two wholesalers)--was intended to be covert and that its purpose was anticompetitive.

### e. Publishers' and Distributors' Assumed Self-Interest

Finally, we note the district court's view that Anderson's conspiracy claim is not plausible because the elimination of Anderson and Source would be contrary to the publishers' and national distributors' self-interest. The court stated that

> more wholesalers yields greater competition, which is good for suppliers.
> Destroying Anderson and Source would reduce the publisher's wholesale
> outlets from four to two and would give Hudson and News Group, the two

43

remaining major wholesalers, 90% of the market share . . . . This is too much market power to yield to wholesalers.

732 F.Supp.2d at 397. We reject this rationale for the dismissal.

First, the defendant publishers and distributors own or control 80 percent of the nation's magazines (see PAC ¶ 80), including, apparently, those that are the most popular (see, e.g., id. ¶¶ 11-18). We doubt that it can be said as a matter of law that these publishers and distributors would have less market power than wholesalers who themselves produce no goods and who, without these publishers and distributors, would lack the most popular magazines to offer to retailers. Nor is it implausible that the publishers and distributors would feel comfortable dealing with just two wholesalers, especially given that those wholesalers were members of the alleged conspiracy.

Second, the court's self-interest rationale disregards the allegations that, under the pre-2009 system, with four national wholesalers competing with each other and operating independently of the publishers, the retailers had more wholesalers from which to choose and could make decisions based on the suppliers' prices. With only two national wholesalers, each with its own allocated territory, many retailers would have no other supplier choice; wholesalers could increase their profits by raising prices to the retailers, and not seek, as Anderson and Source had, to increase charges to the publishers. In the near term at the very least, the conspiracy alleged by Anderson could be expected to benefit the publishers, the distributors, and the two wholesalers who participated.

In this connection, we note that the alleged comment by Jacobsen on the elimination of Anderson and Source, stating that "we now control this space," was interpreted by the district court as merely describing the state of the industry, 732 F.Supp.2d at 402. It is at least as plausible an interpretation (a) that this statement claiming "control" evinced satisfaction with the reduction of the number of national wholesalers to two, and (b) that the "we" in "we . . . control" referred not only to Jacobsen's TWR and its client Time, but to other publishers and distributors as well. If indeed

44

Jacobsen said "we" are in control, it hardly seems possible that the "we" could not have included at least the nation's two largest distributors--Curtis and Kable--and the publishers they represent, i.e., all of the other publishers in this case.

## CONCLUSION

For the foregoing reasons, we conclude that the district court should have allowed Anderson to file the PAC. We have considered all of defendants' arguments in support of the judgment and have found them to be without merit. As the district court's dismissal of Anderson's state-law claims was based on its rejection of the Sherman Act claim, we vacate the dismissal of both sets of claims, and remand for further proceedings. We express no view as to the merits of Anderson's claims or as to whether motions for summary judgment will become appropriate.

Costs to Anderson.